**Lindsey Monroe SMITH, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 66448.**

Court of Criminal Appeals of Texas,
En Banc.

Oct. 22, 1986.

David Botsford, Austin, Emmett Colvin, Dallas, for appellant.

Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

A jury found appellant guilty of murder and assessed his punishment at seventy-five years.

Evidence adduced at trial showed that the victim was shot and killed by appellant at approximately 2:00 p.m. on May 31, 1979. His body was found by law enforcement authorities an hour or two later, tied to a metal feed trough which had been anchored in the bottom of a deep hole in a creek. Appellant's theory at trial was that he had acted in self-defense. Because a detailed rendition of the testimony is necessary for resolution of appellant's grounds of error, we now summarize the pertinent testimony.

David Thompson testified that on the day of the offense, he was visiting his brother-in-law, Johnnie Denton. At approximately 10:00 a.m. appellant drove up to Denton's house, visited awhile, drove away and then returned thirty minutes later. Just as appellant returned, a fire broke out in the house next door and Thompson left to go and assist in extinguishing the blaze. He returned just in time to see appellant driving off down the street with the victim following behind on foot. According to Thompson, appellant appeared to be angry and was telling the victim to meet him at the corner. Thompson related further that he did not see what went on at the corner. Instead he left Denton's house and drove to a store some four blocks away to purchase some cigarettes. Thompson testified that as he was leaving the store after making his purchase, he saw the appellant, accompanied by Micki Lynn Thompson and Roy Alexander, drive up in appellant's pickup. Thompson heard appellant say, "I'm going to get him before dark," apparently referring to the victim. Thompson returned to Denton's house. When he arrived the victim was there and asked him if he would give him a ride. Thompson drove the victim to his mother's house. The victim asked Thompson to wait for him while he went inside. Shortly thereafter, the victim came out and asked Thompson to give him a ride to Lake Tawakoni. Thompson agreed and the two men began the thirty mile drive to the lake. As the two men approached the lake, they passed appellant's truck driving in the opposite direction. Thompson saw that appellant was accompanied by Roy Alexander. Thompson also noticed that as he passed appellant, appellant hit his brakes, turned his pickup around and started following Thompson's car. After being followed for approximately a mile and a half, the victim told Thompson to pull his car into a side road and stop. Thompson did so. The appellant followed and pulled his truck up approximately one or two car lengths behind Thompson's car. The victim exited Thompson's car and began walking toward appellant's pickup. In the meantime appellant got out of his truck and stepped in front of his door. Thompson related that he then heard appellant say, "By God you want some of this?" Thompson then heard four shots in rapid succession and looked up and saw appellant holding a pistol. Thompson related that the victim did not have a weapon and had not said anything to appellant. Immediately after the shooting, appellant pointed the gun at Thompson

and told him that if he said anything to anyone, he (appellant) would blow his head off. Appellant made both Alexander and Thompson help load the victim's body in the back of the truck. Appellant told Thompson he was going to dump the body in the "Calloway bottom" and then he and Alexander drove off. Thompson immediately reported the murder to the authorities. Finally Thompson testified that the shooting occurred at around 2:00 p.m.

Law enforcement personnel arrested both appellant and Alexander a short time later as they were preparing to leave appellant's home. Alexander led authorities to the location of the body and the murder weapon.

The appellant testified that prior to the date of the offense he had never met the victim although he had heard of him and his reputation for being violent. Appellant related that on the morning of the offense as he was driving down the highway towards Johnnie Denton's house, a car driven by a man he later learned to be the victim tried to run him off the road. A few minutes later as he turned onto Denton's street, he saw some friends of his standing on the street corner. He pulled over and was sitting in his truck talking with his friends when the victim walked up and asked him who he was. Appellant told the victim his name and the victim began cursing him and threatening him. According to appellant, the victim told him to get out of the pickup. When he refused and started to drive off, the victim pulled out a knife and cut appellant's arm. Appellant then drove to Johnnie Denton's house. As he was pulling into Denton's driveway, appellant saw the victim running towards him. Not wanting to fight, appellant decided to leave and backed his truck out into the street with the victim still pursuing him. He drove away and was able to elude the victim. Appellant related that he then drove to the West Side Grocery where he met Roy Alexander and Micki Thompson. Appellant admitted seeing David Thompson at the store, but denied making any threats concerning the victim. After leaving the store, appellant dropped Micki Thompson

off and then he and Roy Alexander drove to Lake Tawakoni to purchase some beer. On the way back from the lake, they passed a car which appellant recognized as belonging to David Thompson with two individuals inside. Appellant related that he thought that the two individuals were David Thompson and Johnnie Denton. According to appellant, he looked in his rear view mirror and saw that David Thompson had his brake lights on and had pulled over to the side of the road. At that point appellant slowed down, made a U-turn and followed Thompson's car down the side road. Appellant related that as he pulled up behind Thompson's car, the victim immediately jumped out of the passenger side of the car and started coming towards him. Appellant tried to put his truck in reverse and back out, but his tires started to spin and he could not escape. At that point appellant grabbed the loaded pistol he kept in his truck and stepped out of the pickup. He took one step backward and pointed the pistol at the victim who was standing some five to eight feet from the front of the pickup. According to appellant, the victim who was already holding a knife in one hand, reached into his back pocket and said, "I'm going to blow your goddamn head off." Appellant stepped backwards as the victim advanced. When the victim would not stop, appellant shot the victim. According to appellant it was David Thompson's idea to dispose of the victim's body in the "Calloway bottoms." Appellant related that as he and Roy Alexander were driving to the creek to dispose of the body they passed a deputy sheriff. Appellant told Alexander that they should stop and report the shooting but Alexander picked up appellant's pistol and told him to keep on driving. When they reached the creek Alexander disposed of the body. The two men then proceeded to drive to appellant's home. On the way, they hid the murder weapon under a log.

In his first and second grounds of error, appellant argues that the court erred first, by overruling his objections to the qualifications of Dr. Charles S. Petty and second,

by overruling his motion to strike the testimony of Dr. Petty. Dr. Petty, the Chief Medical Examiner for Dallas County, was called to testify concerning the autopsy performed on the victim. Although Dr. Petty was asked to detail his educational background, his employment history, his duties as chief medical examiner and custodian of the records, the prosecutor neglected to ask the doctor if his license to practice medicine had been properly filed.[1] Appellant's objection to this deficiency was overruled. Appellant now argues that this omission was fatal to the State's case.

In *Cordero v. State,* 164 Tex.Cr.R. 160, 297 S.W.2d 174, (1956), a similar argument was made when the State failed to prove that their expert witness was licensed by the State of Texas or had registered his license in the county where he practiced. This Court, relying on *Silva v. State,* 152 Tex.Cr.R. 545, 215 S.W.2d 887, (1948), found that since the record showed that the doctor was a graduate of Baylor Medical College and had practiced medicine for nine years he was sufficiently qualified to testify as a medical expert. In *Silva v. State, supra,* we stated:

" ... We think the mere fact that he did not have a license would not authorize the court to exclude his entire testimony. It occurs to us that the objection went more to the weight of the testimony than to its inadmissibility. However, the question of whether or not a witness is sufficiently qualified to express an opinion as an expert on a question involving scientific knowledge is a matter for the court to determine after the witness has stated the time devoted to the study of that branch of science, his training and experience. When the court is satisfied that the witness is qualified, then he is permitted to testify, unless it is shown that the court abused his discretion with respect thereto." 215 S.W.2d at 888.

In the instant case, Dr. Petty testified that he graduated from the Harvard Medical School in 1950. He then spent two years in clinical internship in residency at the Mary Imogene Bassett Hospital in Coopertown, New York. Thereafter he moved to Boston and spent three years in specialty training in pathology. In 1955, he moved to New Orleans where he worked first as an instructor and then as an Assistant Professor of Pathology at the Louisiana State University School of Medicine. During this tenure, he was also serving as a pathologist for the coroner for the Parish of Orleans. In 1958, he was hired as an assistant medical examiner for the State of Maryland. After nine years in that position, he moved to Indianapolis, Indiana, where he taught as a professor of forensic pathology. In 1969, he moved to Dallas and accepted the position of Chief Medical Examiner for Dallas County and Director of the Dallas County Criminal Investigation Laboratory. He was still serving in those capacities at the time of trial in August of 1979.

We find that the above was a sufficient showing of Dr. Petty's competency to testify concerning the autopsy performed on the victim. Although it would have been preferable for the prosecutor to have asked the doctor concerning the filing of his license, we find that in the instant case the failure to do so did not constitute reversible error. Appellant's first and second grounds of error are overruled.

In his third ground of error, appellant argues that the court abused its discretion in overruling his motion for continuance. On August 27, 1979, the date set for pretrial, appellant's attorney appeared without the appellant. When the court inquired as to the whereabouts of appellant, defense counsel informed the court that appellant had initially received notice to appear on August 27 and had then received a notice to appear on September 11. Defense counsel inferred that the second notice super-

---

1. At the time of appellant's trial, Article 4498 and Article 4498.1, V.A.C.S. required a physician to file his medical license with the district clerk of every county in which he resided and in which he maintained an office. These two articles were repealed by Acts 1981, 67th Leg., 1st C.S., p. 36, ch. 1, § 6(a), eff. Aug. 5, 1981.

ceded the first notice and had told appellant that the trial had been reset to September 11 and thus he did not have to appear on August 27. The court informed counsel that it was customary for the court to send out two notices so that the parties would know that if the case was not reached the first week it would be reached the second week. The court instructed defense counsel to contact appellant and have him come immediately or else his bond would be forfeited.

Defense counsel informed the court that he was not ready to go to trial immediately but would be ready on September 11. The court instructed appellant to file a motion for continuance if he could not be ready. After a short recess the following occurred:

"THE COURT: Mr. Flynt, approach the bench. Did you get in contact with your man?

"MR. FLYNT: No, sir.

"THE COURT: Is he on his way?

"MR. FLYNT: No, sir.

"THE COURT: Where is he?

"MR. FLYNT: He is in Grand Saline. His wife has the only vehicle and she went to—she works at the bank in Canton. He had no means of transportation. I went by my office and dictated a Motion for Continuance on the machine because my secretary, when I got back to the office, it was seventeen minutes to 12:00. I did not get ahold (sic) of him until eleven minutes to 1:00. He said, I have no way to come unless you come get me.

"I said, I'm due back at 1:00 o'clock and I'm late as it is. I said, I'm informing the court that we'll both be there at 9:00 a.m. in the morning.

"THE COURT: Well, you don't have any pretrial motions?

"MR. FLYNT: I'm going to have a Motion for Continuance. I'm having it typed right now. I didn't have enough time to get it done.

"Judge, this is my fault. I'm very sincere. I thought it was set for the 11th. I'm sincere.

"THE COURT: This is a murder case. This is not just like any other case. I suggest you call Mr. Smith and tell him that he better get his wife off the job or somebody to bring him down here. I can't imagine a man charged with murder giving an excuse that my wife's at work and I don't have a vehicle.

"MR. FLYNT: I just got ahold (sic) of him at eleven minutes to 1:00.

"THE COURT: Of course, the point is, you got ahold (sic) of him. At that point he ought to have started working out a deal where he could get down here.

"MR. FLYNT: Like I say, I can produce him at 9:00 o'clock in the morning.

"THE COURT: But we're going to need to have a chance for pretrial.

"MR. FLYNT: I don't have my motions. When you get back to your office at seventeen minutes to 12:00 and your secretaries have all gone to lunch best you can do is put it on the machine and ask her to draw it and come back as quickly as you can.

"Be perfectly willing to be number one on your next docket. I don't think that's asking a whole lot, not since the confusion was my own."

The next morning when the case was called for trial appellant announced that he was not ready for trial and presented a written motion for continuance. The motion alleged the following as grounds for continuance:

"II.

"That defendant cannot safely go to trial on the above mentioned date for the following reasons, to-wit: That defendant received a notice of setting of this cause for August 27, 1979, and that thereafter, received another notice that his cause was set for September 10, 1979 for pretrial and September 11, 1979 for trial; Defendant naturally assumed that the second notice superceded the first notice and that said cause would go to trial on September 11, 1979. Defend-

ant's counsel found out at 11:15 a.m. on the 27th of August, 1979 that it was expected to be tried that week, and defendant only learned at 12:50 p.m. on that same day that same was expected to go to trial; that Defendant announced ready for trial for September 10, 1979. That Defendant has not had adequate time to prepare on such short notice with the exception that same would be heard on September 11, 1979. That Defendant has only from 3:30 in the afternoon of the 27th of August, 1979 to prepare motions to present to this court prior to 9:30 a.m. on the 28th of August, 1979 and to secure his witnesses and to interview same.

"That Defendant has never been furnished a list of the State's witnesses nor has Defendant been furnished a jury list not (sic) any other information necessary for the defense of this case.

"That this case is a case of major importance involving a possible life sentence and that same should be continued to September 10, 1979 as per the second notice to Defendant. That as of 1:20 a.m. August 28, 1979, Defendant has not located three (3) major witnesses for his defense to testify that Defendant was threatened prior to the commission of said offense by the deceased and they would further testify that defendant left the premises after said threats and that the deceased immediately commenced to follow him.

"That Defendant's attorney made known to the Court that he was set in criminal case on Wednesday, August 29, 1979, in Wood County, Texas, that he has three (3) cases, two (2) civil and one (1) criminal, set on August 30, 1979 in Dallas County, Texas, and three (3) cases set in Wood County, Texas on August 31, 1979, none of which have been continued and all of which cases are prior in nature to the setting originally received in this cause.

"That Defendant has three (3) witnesses in the State of Oklahoma who are not available at this time.

"That Defendant specifically waives the right of speedy trial and states that same will not be an issue at any time in this proceeding.

"That Defendant was in the process of preparing a motion for change of venue on the assumption that said case was going to trial on September 10, 1979, secured no affidavits concerning said motion for change of venue. .

"That defendant's co-counsel, John Fisher, of Dallas, Texas, had no notice of said setting until after 8:00 p.m. on August 27, 1979, and is not available for trial at this time."

Testimony adduced in support of the motion for continuance showed that the notice advising appellant of the August 27th trial setting was mailed on July 24, 1979, and the subsequent notice was mailed on July 27, 1979. The record also reflects that defense counsel was retained on June 28, 1979.

The trial court overruled appellant's motion for continuance prior to jury selection.

A motion for continuance is addressed to the discretion of the trial court and the failure to grant such a motion is not error absent a showing of abuse of discretion. *Hernandez v. State*, 643 S.W.2d 397 (Tex.Cr.App.1982); *Tezeno v. State*, 484 S.W.2d 374 (Tex.Cr.App.1972). We find no abuse of discretion in the instant case. Counsel had been retained on the case for two months at the time of trial. It was counsel's obligation to familiarize himself with the local rules of practice. If counsel had a question as to how to interpret the two setting letters, he should have contacted the court for an official explanation. This ground of error is overruled.

In his fifth ground of error, appellant argues that the trial court erred by refusing to charge the jury that David Thompson was an accomplice witness. He asserts that Thompson's conduct *after* the shooting made him an accomplice witness.

An accomplice witness is someone who participated with another before, dur-

ing or after the commission of a crime; one is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged. *Harris v. State,* 645 S.W.2d 447, 456 (Tex.Cr.App.1983); *Ferguson v. State,* 573 S.W.2d 516 (Tex.Cr.App. 1978). A witness is not deemed an accomplice witness because he knew of the crime but failed to disclose it or even concealed it. *Villarreal v. State,* 576 S.W.2d 51 (Tex.Cr. App.1979); *Ferguson v. State, supra; Easter v. State,* 536 S.W.2d 223 (Tex.Cr. App.1976). Mere presence at the scene of the offense does not compel the conclusion that the witness is an accomplice witness. *Brooks v. State,* 686 S.W.2d 952 (Tex.Cr. App.1985); *Arney v. State,* 580 S.W.2d 836, 839 (Tex.Cr.App.1979); *Easter v. State, supra.*

■ According to Thompson's testimony he played no part in the shooting and only helped move the deceased's body when he was ordered to by appellant. Appellant on the other hand testified that it was Thompson's idea to hide the deceased's body in the Calloway river bottom. There is no testimony which indicates that Thompson played any part in the commission of the offense. Since there was no evidence adduced at trial to show anything other than Thompson's presence at the scene of the offense and his aid in carrying the body to appellant's truck, we hold that the trial court did not err in refusing to instruct the jury that he was an accomplice witness. *Russell v. State,* 598 S.W.2d 238 (Tex.Cr. App.1980); *Kerns v. State,* 550 S.W.2d 91 (Tex.Cr.App.1977). Appellant's fifth ground of error is overruled.

Immediately prior to trial, appellant made an oral request that the State furnish him with the National Crime Information Center (N.C.I.C.) criminal records of David Thompson, Roy Alexander and the deceased. Appellant argued that he needed these criminal records for purposes of cross-examination. The prosecutor responded that such records were for the exclusive use of law enforcement agencies, and if he had such records, he would be restricted by law from disclosing such records to the defense. The court overruled appellant's request. Appellant now contends that the trial court erred in refusing to order the prosecutor to supply appellant with these records. He asks that his appeal be abated in order that the trial court can secure these records and supplement the appellate record.

Article 39.14, V.A.C.C.P., provides that before a defendant is entitled to discovery of matters related to his case the defendant must show good cause, materiality and that such requested information is "in the possession, custody or control of the State or any of its agencies."

■ While such records presumably would have been beneficial in the cross-examination of David Thompson and in showing the violent character of the deceased, there has been no showing that such records in fact exist. Under this state of the record then, we are constrained to find no error. *Thompson v. State,* 612 S.W.2d 925 (Tex.Cr.App.1981); *Martinez v. State,* 507 S.W.2d 223 (Tex.Cr.App.1974); *Thomas v. State,* 482 S.W.2d 218 (Tex.Cr.App.1972); *Garcia v. State,* 454 S.W.2d 400 (Tex.Cr. App.1970). As to Roy Alexander, the record reflects that he did not testify. Therefore, any record regarding his criminal history would not have been relevant to the instant prosecution.

Compare the instant case to *Reed v. State,* 644 S.W.2d 494 (Tex.App.—Corpus Christi 1982, petition refused). In *Reed,* the defendant made a similar complaint on appeal. This court sustained Reed's complaint but noted that this was because Reed had shown the use for the evidence and had shown the existence of such evidence. The record contained a bill of exceptions in which Reed presented the custodian of records for the Victoria Police Department, who testified that the department had a computer terminal through which they could gain access to the National Crime Information Center records, as well as its own index file reflecting contacts of an individual with the Victoria Police Department. Furthermore, defendant Reed also pointed out that the State had a copy of his

criminal record, indicating that the State had the capacity to obtain such records. The trial judge in *Reed*, after denying the defendant's request for discovery, ordered the custodian of the records to obtain the requested N.C.I.C. printouts and these materials were made a part of the appellate record.

If appellant had demonstrated that such records existed, we would be compelled to sustain his ground of error. We do not feel it is our burden to order a supplementation of the record as appellant requests. Appellant had adequate opportunity to perfect a bill of exceptions as was done in *Reed* and demonstrate the existence of such records. His failure to carry his burden of proof mandates that we overrule this ground of error.

■ In his seventh ground of error, appellant alleges that the evidence is insufficient to support his conviction. Specifically, he argues that, since the indictment alleged he killed "Leonard DeWayne Harris" but the deceased was only referred to at trial by the names of "Leonard Harris" and "Leonard D. Harris," the State failed to prove they were in fact the same person. We disagree. A middle name or initial may be disregarded. Thus, a failure or mistake in proving the middle name of the victim alleged in the indictment is neither material nor fatal. *Harrington v. State,* 547 S.W.2d 621 (Tex.Cr.App.1977); *Martin v. State,* 541 S.W.2d 605 (Tex.Cr.App.1976).

■ In two grounds of error, appellant complains of fundamental error in the jury charge. In *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1985), we reevaluated the doctrine of fundamental error in the court's charge. Under our holding in *Almanza,* no longer will error in the court's charge mandate automatic reversal. Rather, in the absence of an objection at trial, reversal will not occur unless the error was so egregiously harmful that as a result of the error, the appellant was denied a fair and impartial trial. In making this determination, the reviewing court is to review the entire jury charge, the evidence adduced at trial, the arguments of counsel and any

other relevant information contained in the trial record. With this framework in mind we turn to the instant case.

The court's charge reads as follows in pertinent part:

"Now if you should find and believe from the evidence *beyond a reasonable doubt* that on or about the 13th day of May, 1979, in Rains County, Texas, the defendant, Lindsey Monroe Smith, Jr., did intentionally or knowingly cause the death of one Leonard Dewayne Harris by shooting him with a gun, as set forth in the indictment, then you will find the defendant guilty of murder.

"Unless you so find *beyond a reasonable doubt,* or if you have a *reasonable doubt* thereof, you will acquit the defendant of the offense of murder, and consider whether he is guilty of the lesser offense of voluntary manslaughter.

"A person commits voluntary manslaughter if he intentionally or knowingly causes the death of an individual, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

" 'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed, which passion arises at the time of the offense and is not solely the result of former provocation.

" 'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

"Now if you find from the evidence *beyond a reasonable doubt* that on or about the 13th day of May, 1979, in Rains County, Texas, the defendant, Lindsey Monroe Smith, Jr., did then and there intentionally or knowingly cause the death of Leonard Dewayne Harris, an individual, by shooting him with a gun, but you further find and believe from all the facts and circumstances in evidence in the case, the defendant, in

killing the deceased, if he did, acted under the immediate influence of sudden passion arising from an adequate cause, as those terms have been defined, or if you have *a reasonable doubt* as to whether or not the defendant acted under the immediate influence of a sudden passion arising from an adequate cause, then you will find the defendant guilty of voluntary manslaughter.

"Unless you so find *beyond a reasonable doubt,* or if you have *a reasonable doubt* thereof, you will acquit the defendant and say by your verdict 'not guilty.'

.     .     .     .     .

"Therefore, even if you believe from the evidence *beyond a reasonable doubt* that the defendant shot Leonard Dewayne Harris with a gun, as alleged, but you further believe from the evidence, or you have *a reasonable doubt* thereof, that at the time he did so the defendant reasonably believed that Leonard Dewayne Harris was using or attempting to use unlawful deadly force against him, and that he reasonably believed, as viewed from his standpoint alone, that the use of force and the degree of force used were immediately necessary to protect himself against Leonard Dewayne Harris's use or attempted use of deadly force, and that a reasonable person in the defendant's situation would not have retreated, you will find the defendant not guilty.

"However, if you believe from the evidence *beyond a reasonable doubt* that, at the time and place in question, the defendant did not reasonably believe that Leonard Dewayne Harris was using or attempting to use unlawful deadly force against him, or that the defendant did not reasonably believe that the use of force and the degree of force used were immediately necessary to protect himself from Leonard Dewayne Harris's use or attempted use of deadly force, or that a reasonable person in the defendant's sit-

uation would have retreated, you will find against the defendant on this plea of justification.

.     .     .     .     .

"The defendant is presumed to be innocent until his guilt is established by legal evidence *beyond a reasonable doubt,* and in case you have *a reasonable doubt* as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him." (emphasis added)

Initially appellant contends that the charge is fundamentally defective because the jury was not instructed that they could not convict appellant unless *each element* of the offense was proven beyond a reasonable doubt.

Essentially our inquiry under *Almanza* is two-pronged. First, we must determine if error is present in the charge. If we find error, then we must determine if it is "egregious". We find it unnecessary to reach the second prong with respect to appellant's contention. In *Eckert v. State,* 623 S.W.2d 359 (Tex.Cr.App.1981), we were faced with a similar charge and a similar argument on appeal. We found no error.

" ... There is no requirement that the burden of proof should be applied by the court's charge to each element in a separate and distinct manner. A reading of the entire [application] paragraph in the context of the charge as a whole requires that the jury find each and every element of the offense beyond a reasonable doubt. ..." *Eckert v. State,* 623 S.W.2d at 362–363. (material in brackets added)

See also *Adams v. State,* 588 S.W.2d 597 (Tex.Cr.App.1979). We find no error in the instant case. This ground of error is overruled.

In his second supplemental brief[2], appellant argues that the trial court committed fundamental error by failing to place, in the application paragraph of the charge regarding murder, the defensive issue of sudden passion. Appellant relies on *Co-*

2. Appellant has filed three supplemental briefs each of which contains a new ground of error.

We are reviewing these grounds in the interest of justice.

barrubio v. State, 675 S.W.2d 749 (Tex.Cr. App.1984). As shown above, the court charged the jury on murder and on the lesser included offense of voluntary manslaughter.

Appellant is correct that in Cobarrubio, we held that if voluntary manslaughter was raised by the evidence, then the trial court must instruct the jury, in the charge on murder, that in order to convict the defendant of murder, the jury must find beyond a reasonable doubt, the absence of sudden passion.

Examining the evidence adduced at trial, we find that the offense of voluntary manslaughter was not raised. Appellant testified at trial that at the time of the shooting he was "scared to death" and that he shot the deceased because he thought the deceased was reaching for a weapon. Other than this testimony, there is no other testimony going to appellant's emotional state at the time of the killing.

■ It has been held that more than a bare claim of "fear" is required to show sudden passion. Moore v. State, 694 S.W.2d 528, 529 (Tex.Cr.App.1985); Daniels v. State, 645 S.W.2d 459 (Tex.Cr.App. 1983); Wolford v. State, 675 S.W.2d 530 (Tex.App.—Houston [14th] 1983, petition refused); Oliva v. State, 663 S.W.2d 656 (Tex.App.—Corpus Christi 1983, no petition). Prior provocation or anger is not alone sufficient to raise the issue of voluntary manslaughter. Moore v. State, supra. Nowhere in the record in the instant case is there evidence that appellant became enraged or terrorized as an immediate result of the victim's acts. Lamb v. State, 680 S.W.2d 11 (Tex.Cr.App.1984).

During jury argument, the main thrust of defense counsel's argument was that appellant was acting in self-defense. Defense counsel mentioned voluntary manslaughter only at two instances in their argument. The first occurred when one of the defense attorneys defined voluntary manslaughter and then made the statement, "Someone coming at me with a knife I think I'd be in terror." The second instance occurred when counsel was discuss-

ing the presumption of innocence and stated the following:

"And, you just heard the testimony of the Jones boy and Micki today. That has certainly created in my mind a reasonable doubt that this man could not have been guilty of murder or voluntary manslaughter."

Counsel's statement set out above that he would be in terror if someone was coming at him with a knife is interesting and may be helpful in showing that there might have been adequate cause from which "sudden passion" could have developed. Unfortunately, the evidence does not indicate that sudden passion played any part in appellant's actions. According to appellant's own testimony, he was afraid of the deceased. Beyond that there is nothing more in the record as to appellant's emotional state of mind. And although it is possible that "sudden passion" arose in appellant, the record does not support that conclusion.

■ A review of the evidence in the instant case shows that the issue of voluntary manslaughter was not raised. Therefore, appellant did not suffer "egregious harm" and reversal is not necessary. Moore v. State, 694 S.W.2d 528 (Tex.Cr. App.1985); cf. Castillo-Fuentes v. State, 707 S.W.2d 559 (Tex.Cr.App.1986). This ground of error is overruled.

In another supplemental brief, appellant argues for the first time that the prosecutor committed fundamental error when he impeached the appellant's testimony with his post-arrest silence. On direct testimony appellant testified that he shot the victim while acting in self-defense. On cross-examination, the prosecutor was allowed to question appellant concerning his silence after his arrest. There was no objection to this line of questioning. Appellant acknowledges the lack of objection but urges that such a violation of due process rises to the level of fundamental error.

In Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 48 L.Ed.2d 91 (1976), the United States Supreme Court held that impeach-

ment of an arrestee by the use of post-arrest, post-*Miranda* silence violates an arrestee's privilege against self-incrimination and his right to due process under the federal constitution. In *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Supreme Court amplified the rule announced in *Doyle* and held that in the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, a state does not violate federal due process of law or the Fifth Amendment by permitting cross-examination as to post-arrest silence when a defendant chooses to take the stand. The Supreme Court further held that a state is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which post-arrest silence may be deemed to impeach a criminal defendant's own testimony.

In the recent case of *Sanchez v. State*, 707 S.W.2d 575 (Tex.Cr.App.1986), we followed the Supreme Court's announcements in *Fletcher* and enunciated our own rule in post-arrest, pre-*Miranda* situations:

> "An accused's right to be free from compelled self-incrimination under the Texas Constitution arises at the moment an arrest is effectuated.... Under the decisions of this court, once the state has restrained the liberty of the defendant to the degree that an arrest has occurred, privilege attaches to its fullest extent. Conversely, the right to remain silent does not arise when arresting officers deign to verbalize that right, but rather at the very moment the arrest is accomplished. Since the defendant's right against self-incrimination arises when he is arrested, post-arrest silence is presumed an exercise of that right. The State may not, therefore, violate the defendant's right against self-incrimination by the use of post-arrest silence. Accordingly, we hold that pursuant to Art. I, § 10 of the Texas Constitution, when the defendant is arrested, he has the right to remain silent and the right not to have that silence used against him, even for impeachment purposes, regardless of

when he is later advised of those rights." *Sanchez v. State*, 707 S.W.2d at 575.

We also held in *Sanchez* that absent a showing of actual inconsistency, post-arrest silence is not probative as evidence of prior inconsistent conduct and thus impeachment through the use of post-arrest silence is improper under Texas evidence law.

■■■ The instant case falls into the post-arrest, pre-*Miranda* type situation discussed in *Sanchez*. There is no testimony in the record which affirmatively shows that appellant was given his *Miranda* warnings, prior to the time about which he was questioned by the prosecutor. As noted above however, appellant voiced no objection to the questioning at trial. Furthermore, we disagree with appellant's assertion that such error is fundamental. It is well settled that almost every right, constitutional and statutory, may be waived by the failure to object. *Borgen v. State*, 672 S.W.2d 456 (Tex.Cr.App.1984); *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976); *Evans v. State*, 444 S.W.2d 641 (Tex.Cr.App.1969). Because of appellant's failure to voice an objection, we are compelled to find that the error, if any, has not been preserved for our review. Appellant's ground of error is overruled.

Finally, in his last supplemental ground of error, appellant contends that the trial court erred in making an affirmative finding that the appellant used a deadly weapon during the commission of the offense. It is undisputed that the trial judge included the following in appellant's judgment:

> "Additionally it is found by the Court that the Defendant, Lindsey Monroe Smith, Jr. used and exhibited a deadly weapon, to-wit: a pistol, during the commission of this offense. The Court further finds the said pistol was a fire arm (sic)."

■■■ Since appellant was tried by a jury the court had no authority to make an affirmative finding that appellant used a deadly weapon. Art. 42.12, Sec. 3f(a)(2), V.A.C.C.P.; *Ex parte Thomas*, 638 S.W.2d 905 (Tex.Cr.App.1982). Thus we must de-

termine whether the jury made an affirmative finding as to a deadly weapon. In the recent case of *Polk v. State*, 693 S.W.2d 391 (Tex.Cr.App.1985), this Court held the following:

"Where the jury is the trier of fact, the trial court may not properly enter that they have made an affirmative finding concerning the defendant's use or exhibition of a deadly weapon or firearm during the commission of the offense unless:

1) the deadly weapon or firearm has been *specifically* pled *as such* (using the nomenclature 'deadly weapon') in the indictment (Applies where the verdict reads 'guilty as charged in the indictment.' [citation omitted]);

2) where not specifically pled in '1)' above as a deadly weapon or firearm, the weapon pled is per se a deadly weapon or a firearm; or,

3) a special issue is submitted and answered affirmatively. [footnote omitted]" 693 S.W.2d at 396.

Applying the above, we find that neither of the three instances is present in the instant case. The indictment alleged that appellant:

"did then and there knowingly and intentionally cause the death of Leonard Dewayne Harris by shooting him with a gun."

As can be seen the indictment did not include the language "deadly weapon." Nor did the indictment allege the use of a deadly weapon per se because it has long been established that a gun is not a deadly weapon per se. *Boyett v. State*, 692 S.W.2d 512 (Tex.Cr.App.1985). Thus neither of the first two instances have been satisfied. A review of the record shows that no special issue concerning the use of a deadly weapon was ever submitted to the jury. Thus we find that the affirmative finding was improperly entered on the judgment.

Because we find the trial judge was without authority to make the affirmative finding of a deadly weapon, we order the affirmative finding stricken from the judg-

ment and reform the judgment by deleting the improper finding.

Appellant's conviction as reformed, is affirmed.

TEAGUE, J., dissents.

CLINTON, Judge, concurring.

Once again there is attributed to *Daniels v. State*, 645 S.W.2d 459 (Tex.Cr.App.1983), a *holding* that was not made: "that more than a bare claim of 'fear' is *required* to show sudden passion." Maj. Opinion, 16. (All emphasis is mine).

In *Daniels* we were attempting to clarify significance of a statement in *Luck v. State*, 588 S.W.2d 371 (Tex.Cr.App.1979), that accused never indicated "he was in fear of the deceased," *id.*, at 374, because counsel for Daniels was pointing to his testimony that he had been "afraid that [the deceased] was going to kill [him]." Regarding the observation in *Luck* "as a factual one rather than a statement of legal reasoning, since an accused ... does not necessarily raise the issue of voluntary manslaughter by indicating that at the moment of taking action to defend himself he was fearful of his attacker," we said, "*In such circumstances*, a bare *claim* of 'fear' does not *demonstrate* 'sudden passion arising from adequate cause.'" *Id.*, at 460.

Having explained in the remark in *Luck*, we then went on to examine other testimony of Daniels indicating that whatever "fear" he may have felt did not prevent him from evaluating his predicament; we found "[his] own appraisal of his situation reveals that he had reflected on it, knew what he had to do and did it." *Ergo*, no "sudden passion" with cause, rendering "the mind incapable of cool reflection." V.A.T.C. Penal Code, § 19.04(c).

With that understanding of *Daniels*, I join the opinion of the Court.