Opinion filed July 31, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed July 31,
2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                     Nos. 11-07-00163-CR, 11-07-00164-CR, &
11-07-00165-CR 

                                                     __________

 

                                JONATHAN
MARK HART, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                  On Appeal from the 91st District Court

 

                                                        Eastland
County, Texas

 

                                  Trial
Court Cause Nos. 19,440, 19,451, & 19,457

 



 

                                                                   O
P I N I O N

 








This
is an appeal from a judgment revoking Jonathan Mark Hart=s community supervision in three cases.  In
1999, following a jury trial, Hart was convicted of three separate second
degree sexual assault offenses involving three different minor victims in Cause
Nos. 19,440, 19,451, and 19,457.  Pursuant to the jury=s verdict, he was sentenced to three separate
ten-year terms of confinement in the Texas Department of Criminal Justice, Institutional
Division.  On the jury=s
recommendation, the trial court suspended the imposition of each sentence and
placed Hart on community supervision for ten years for each offense.  In 2006,
the State filed a motion to revoke community supervision, alleging ten
violations.  After the hearing, the trial court announced that it found that
Hart had committed the ten violations, revoked Hart=s community supervision, and entered judgment
sentencing Hart to ten years confinement in each case, running concurrently.

In
Hart=s first issue, he
asserts that the community supervision conditions that he allegedly violated
amounted to unconstitutional restrictions on Hart=s
freedom of religion.  In Hart=s
second issue, he asserts that the evidence was insufficient to support the
findings of true by the trial court.  We affirm.

Standard
of Review

The
State has the burden of showing by a preponderance of the evidence that the
defendant committed a violation of the conditions of community supervision.  Cobb
v. State, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993); Kulhanek v.
State, 587 S.W.2d 424, 426 (Tex. Crim. App. 1979).  The trial court=s order revoking community
supervision is reviewed under an abuse of discretion standard.  Rickels v.
State, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); Cardona v. State,
665 S.W.2d 492, 493 (Tex. Crim. App. 1984).  The trial court is the sole judge
of the credibility of the witnesses and the weight given to their testimony,
and the evidence is reviewed in the light most favorable to the trial court=s ruling.  Cardona,
665 S.W.2d at 493; Garrett v. State, 619 S.W.2d 172, 174 (Tex. Crim.
App. 1981).  If the State fails to meet its burden of proof, the trial court
abuses its discretion in revoking the community supervision.  Cardona,
665 S.W.2d at 493-94.  Proof by a preponderance of the evidence of any one of
the alleged violations of the conditions of supervision is sufficient to
support a revocation order.   Tex. Code
Crim. Proc. Ann. art. 42.12, '
21(b) (Vernon Supp. 2007); Moore v. State, 605 S.W.2d 924, 926 (Tex.
Crim. App. 1980); Leach v. State, 170 S.W.3d 669, 672 (Tex. App.CFort Worth 2005, pet. ref=d).

A
claim of insufficient evidence is limited to the traditional legal sufficiency
analysis that requires us to view the evidence in the light most favorable to
the decision to revoke; it does not extend to a factual sufficiency review.  Becker
v. State, 33 S.W.3d 64, 66 (Tex. App.CEl
Paso 2000, no pet.); Joseph v. State, 3 S.W.3d 627, 642 (Tex. App.CHouston [14th Dist.] 1999,
no pet.); Johnson v. State, 2 S.W.3d 685, 687 (Tex. App.CFort Worth 1999, no pet.).








Background

Hart=s sexual assault offenses
involved teenage girls in Eastland where Hart was a church youth minister. 
Shortly after his convictions, Hart=s
community supervision was transferred from Eastland to Henderson County.  Hart=s alleged violations
occurred in 2006.  The director of the Henderson County Community Supervisions
and Corrections Department, Ty Choate, testified at the hearing that his
department had implemented a new system for sex offenders to better enforce the
conditions of community supervision, protect the community, and address the
needs of the sex offender.  Hart was assigned a different sex offender
therapist and placed on more intensive supervision.  Shortly after Choate
implemented the new program, Hart requested a meeting with Choate to voice his
complaints that the program was overly restrictive, that the sex offender
therapist had singled him out, and that he was not being treated fairly. 
Choate investigated Hart=s
complaints and found that Hart Awas
being treated exactly the same way as every other offender@ going through the
program.  Hart continued to have conflicts with his sex therapist and his
community supervision officer and had additional visits with Choate.

In
its motion to revoke Hart=s
community supervision, the State alleged that Hart had violated Condition No. 5
of his community supervision by failing to report in person on February 2,
2006, at 3:00 p.m. and September 12, 2006, at 4:30 p.m.

The
State also alleged that Hart had violated Condition No. 34 of his community
supervision (under section AIV.
Sex Offender Conditions@)
by failing to abide by all rules and regulations of the sex offender treatment
program, by failing to be responsible for any costs of the program, and by
being discharged from the program on December 14, 2006.  Condition No. 34
required Hart to attend and participate in a sex offender program; to
participate in psychological, psychiatric, and psycho-physiological testing and
report for clinical polygraph examinations as directed by the therapist; to
abide by all rules and regulations of the program; and to be responsible for
any costs of the program. The State further alleged that Hart had admitted to
the community supervision officer on October 11,  2006, that he had not
been honest during the polygraph examination on that day with the polygraph
examiner.








Hart=s conditions of community
supervision had originally omitted Condition No. 35; however,  after Hart was
placed on community supervision on February 24, 1999, the court amended Hart=s community supervision
order on April 26, 1999, by adding Condition No. 35.  That amendment stated
that Hart was to have no unsupervised contact with children under the age of
seventeen and that he was not to frequent, remain about, or enter any place
where children under the age of seventeen congregate.  Subsequently, on May 18,
2006, Hart=s community
supervision officer requested that Condition No. 35 be further amended as
follows, which request was granted: 

Have
no unsupervised contact with children under the age of seventeen.  Do not
frequent, remain about, or enter any place where children under the age of
seventeen congregate, excepting the United Pentecostal Church, located at 101
McArthur, Athens, Henderson County, Texas, 75751 for regularly scheduled
services only on Sundays from 11:00 a.m. to 12:00 p.m., and 6:00 p.m. to 7:00
p.m. and Wednesdays from 7:30 p.m. to 8:30 p.m.  In addition, Defendant is to
only attend when at least one of his approved chaperones is present and gives a
signed statement to the supervision officer stating whether or not Defendant
had any contact with children under the age of seventeen years and providing
the details of that contact.  Further, Defendant is restricted to the main
auditorium or sanctuary and is prohibited from youth groups, Sunday school
rooms, or any other part of the church buildings or property where children
under the age of seventeen years congregate.

 

The State
alleged five violations of the amended Condition No. 35.

Hart=s First Issue

In
Hart=s first issue, he
argues that the amended conditions imposed by the trial court on May 18,
2006, were invalid as they constituted a violation of Hart=s right to freely exercise
his religious beliefs.  Hart did not make this argument to the trial court, and
it has been waived.  To preserve error, there must be a timely, specific
request, objection, or motion.  Tex. R.
App. P. 33.1.  Even constitutional errors may be waived by failure to
raise the issue to the trial court.  Briggs v. State, 789 S.W.2d 918
(Tex. Crim. App. 1990); Smith v. State, 721 S.W.2d 844 (Tex. Crim. App.
1986).  Hart failed to make this objection to the trial court.  Hart=s first issue is overruled.

We
further note that the State only had to prove one violation of the community
supervision conditions.  Even if Hart had preserved this issue and assuming his
success in this argument, the State proved other violations that support the
revocation order.  








Hart=s Second Issue

In
Hart=s second issue,
he argues that the trial court abused its discretion in revoking Hart=s community supervision
because the cause for revocation was not established by the evidence.  We
disagree.  There is evidence that Hart failed to report as directed and that he
violated Condition Nos. 34 and 35.

Hart=s community supervision
officer, Donna Ward, testified that Hart had been difficult to supervise and
noncompliant with the program requirements for sex offenders.  Ward supervised
the sex offenders for the Henderson County Community Supervision and
Corrections Department.  Ward stated that the community supervision records
reflected that Hart=s
prior community supervision officer also had concerns about Hart.  On one
occasion, Hart had been given permission to visit his grandmother in Eastland
but had gone to see his in-laws who lived across the street from one of his
earlier victims. Also, that community supervision officer documented concerns
and conversations with Hart about his taking a position of authority or trust
in a church, his being a pastor and counseling female members, and his feelings
of power through positions in a church.  Hart changed churches two or three
times and started his own church on one occasion.  Ward became his community
supervision officer in January 2005.

 Ward
testified that Hart had failed to report at 4:30 p.m. on September 12, 2006,
but that Hart had appeared at 4:55 p.m. and that she rescheduled the
appointment.  Ward also testified that Hart had failed to report as directed on
February 2, 2006, at 3:00 p.m. and that later he was given an appointment for
February 24.  Hart does not dispute the violations but argues that these were
not violations because he made up the appointments.  The missed appointments
were violations.  Their significance in this case was that they were
indications that Hart did not want to cooperate with the new sex therapy
treatment program.  Ward started Hart back into intensive sex offender
counseling on September 7, 2005, after he had failed his polygraph exam and
made admissions after the exam. 








The
State also alleged that Hart failed to abide by all rules and regulations of
the sex offender treatment program, failed to be responsible for costs of the
program, and was discharged from the program on December 14, 2006, as being
unsuccessful.  Brack Dempsey, Hart=s
community supervision officer in Eastland and the custodian of records for sex
offender cases, introduced Hart=s
records.  Dempsey stated that he had received a letter from the Henderson
County sex therapist advising him that Hart had been discharged from the sex
offender treatment program for failing polygraphs, being dishonest about
grooming behaviors, grooming a particular fifteen-year-old girl in his church,
having fantasies about another woman and the fifteen-year-old girl while having
sex with his wife, and being dishonest with his counselor.  Because of the
violations and lack of progress by Hart reflected in the records, Dempsey
expressed his opinion that Hart was a significant risk to society and that he
would be very concerned if Hart Awere
returned to supervision with anything less than an extension for further
treatment.@  Dempsey
further expressed his doubt that Hart would receive any benefit from further
therapy.

During
cross-examination, Dempsey agreed that the records reflected that Hart had
apparently made progress under his previous sex therapist, John C. Motley, and
that the more negative reports on Hart began almost immediately after Motley
was replaced by the new therapist, Linda Young.  On redirect examination,
Dempsey stated that the records reflected that Hart had only volunteered
information that he was grooming a fifteen year old in church after he was
caught being deceptive on the polygraphs.  Dempsey also stated that Motley had
learned that Hart had lied to him.  Hart had been adamant to Motley that he had
had sexual contact with no one but his wife since being on community
supervision; however, Hart later admitted to Motley that he had, in fact, had
sexual contact with someone he worked with.  In discussing a failed polygraph
with Motley, Hart admitted that a twenty-year-old woman at his place of
employment had performed oral sex on him in his van.

Linda
Young testified that she was a licensed sex offender treatment provider and had
been counseling for sixteen or seventeen years.  She first met Hart in November
2005.  Young testified that initially Hart had a difficult time accepting
responsibility for the three sexual assaults for which he was convicted,
blaming the victims, society, and the way women dress.  She stated that it was
unusual that Hart did not have empathy for his victims because, after seven
years of therapy, an offender should be taking responsibility for his actions
and be able to identify how they had harmed the victim and the family.  Young
did a biopsychosocial assessment of Hart that showed that Hart had begun using
pornography when he was thirteen or fourteen and became Ahooked@
on it.  Based on the overall assessment, Young concluded that Hart was Avery much at risk@ and noted:








His denial is
pervasive.  He is involved with an unsuspecting church and continuing to
becoming more visible within the church.  He failed his last polygraph.  His
thinking is very concrete and similar to that of a pedophile.  He can
manipulate chaperone[s] and has access to multitudes of potential victims.  My
recommendations are Mr. Hart, his church leaders and his wife have an immediate
meeting with probation and myself.  We will go from there.

 

Young
testified that she did meet with church members.  She was concerned with Hart=s Agood-guy thinking error@ where a person comes across as very caring,
supportive, empathetic.  Young stated that that situation was quite dangerous
for someone who has a problem with sexual offenses, especially in a church
setting.  Even though she advised the church members, Young believed that they
did not take her seriously enough to supervise Hart as they should have.

Young
stated that, after failing a polygraph, Hart had admitted to his group that he
had been having thoughts and fantasies about another adolescent female and that
he admitted to grooming that female.  After that admission, Young told Hart
that she did not want him to return to church Auntil
we could resolve this and figure out what we needed to do.@  However, Hart did go back
to church and lied to her about doing so.  Young described Hart as being very
charismatic, quite likeable, and good at making people believe that he was
harmless.  In her opinion, Hart was a risk because he was a sex offender who
minimized and lied to himself, continued to put himself at risk where he could
potentially re-offend, and did not acknowledge to himself that he put himself
at risk.

Hart
argues that the record shows that there were only two overt acts at the church
involving the fifteen year old.  Hart had put a sticky note on the back of a
woman sitting in front of him at church.  The woman walked to the front of the
church, and the fifteen-year-old female took the sticky note off.  Hart went to
the girl and asked her why she took the sticky note off, and they laughed and
conversed about it.  On another occasion, Hart shook hands with the fifteen
year old.  Hart argues that those two brief encounters cannot be considered
grooming.








Although
those were brief contacts, the reports reflect that Hart admitted to his group
that Ahe ha[d] been
grooming a potential victim in church and fantasizing regarding his victim.@  The fifteen year old
reminded him of one of his victims in Eastland because she was Areally built@ and wore Atight-fitted clothes.@  In the September 27, 2006
report, Hart stated that he seldom went to church because he had realized he
truly was back in his cycle; that he was grooming the girl; that he was
disappointed in himself; and that, although he would not re-offend, he Awas a short distance from
re-offending.  The girl I was noticing and making the comments about her
clothes, mannerisms, voice, et cetera, could have been my next potential
victim.@  Hart also
admitted to having sexual thoughts about the fifteen year old while having sex
with his wife.  Hart=s
admissions, made after being in therapy for seven years and usually made only
after failing polygraph examinations, deeply concerned Young.  Young emphasized
that, while treatment stresses the warning signs and inappropriate and
dangerous behavior,  Hart was allowing himself to go near his Afantasy.@  That put him in a very
dangerous spot.  Hart talked to his group about how he was grooming the girl.

Young
stated that she did not like to discharge anyone from the group counseling and
that  she wanted everyone to succeed.  However, Young finally concluded that
Hart was not willing to give up his deviant behavior in order to do what it
would take to make progress.

Hart=s community supervision
officer, Ward, confirmed Young=s
assessment of Hart=s
propensity to re-offend.  Ward and Hart discussed his various fantasies and
failures to make disclosures until after he had failed the polygraph tests. 
She admonished Hart after he admitted that he had engaged in conversation with
the fifteen-year-old girl, who reminded him of one of his previous victims, and
that he had started secret sharing with the girl.  Ward also related a
conversation with the mother of the fifteen-year-old girl where Ward was told
that Hart had asked the girl and her younger brother to go on his paper route
with him one night without any supervision and that the mother would not allow
them to go with Hart.

Choate,
the director who implemented the new sex offender program, agreed with the
assessments of Hart by Ward and Young.  Choate testified that Hart Awas being very
noncompliant, argumentative and just not willing to follow the steps of the
counseling program.@ 
Choate expressed his opinion that Hart was not being honest with the
department, himself, or the therapy program.

Hart
argues that Young was biased against him, telling him that Ahe just pissed [her] off,@ that Young did not know
how Hart lived with himself, and that she did not know how his wife could stay
with him.  Young admitted that she may have made such statements to Hart and
gave the following explanation:

Sex
offender therapy is very confrontative [sic] by nature because of
denial. . . . It=s
impossible to be gentle and subtle with these folks because they will see that
as an opportunity to manipulate.  Their denial is so great.  It=s a way to get through that
denial at times.  Mr. Hart was greatly offended that I said these things, which
kind of shows you where he was at in treatment.

 








Hart=s other argument is that
the revocation was based on his thoughts and that there was no physical action
that would warrant revocation.  Hart=s
witnesses included the mother of the fifteen-year-old girl, who stated that she
was not concerned about her daughter=s
safety because she was watching Hart.  Various other members of the church
testified that there was no inappropriate or unsupervised contact between Hart
and the girl, that Hart was always within sight of a chaperone, and that Hart
never acted inappropriately at church.

Condition
No. 34 required Hart to attend and participate in the sex offender program
approved by the trial court and to abide by all rules and regulations of the
program.  Hart has confused an appearance of participating in a sex offender program
and abiding by its rules and regulations with a sincere and good faith
participation in the program.  Condition No. 34 contemplates that Hart would
make a sincere and good faith effort to participate in the sex offender program
to overcome his problem of sexual attraction to fifteen-year-old girls.  There
is substantial evidence that Hart did not make that sincere and good faith
effort to change his behavior, and it is not surprising that the Henderson
County community supervision officers discharged Hart from their sex treatment
program.  The problems became evident even to Hart=s first community supervision officer and to
Motley, his first sex therapist.

Ward
testified that Hart told her what she wanted to hear but that his actions
showed that he was not sincere.  Young testified that Hart was not sincere in
trying to overcome his problem:  he only followed the rules (when he did)
because he had to.  Choate testified that Motley, the previous therapist, had
problems with Hart during the last few months of Motley=s supervision.  Also, the record reflected
that Motley was extremely concerned that there had been a change in Hart=s belief structure, habits,
and practices toward the end of the time that Motley was the therapist with
Hart.  According to Ward, Hart=s
previous community supervision officer also had concerns about Hart. 

The
evidence was sufficient to support a finding that Hart violated Condition No.
34.  There was also evidence that Hart violated Condition No. 35.  For example,
Hart did not give a written statement to his community supervision officer
about the two contacts he had with the fifteen-year- old girl in the church as
required by Condition No. 35.  Instigating the conversation with the girl was
also a violation that was not disputed.  Hart=s
only defense was that these contacts did not appear to be inappropriate. Those
conditions had nothing to do with his freedom to worship. Hart=s second issue is
overruled.








Trial
courts possess broad discretion over defendants who are placed on community supervision. 
Tex. Code Crim. Proc. Ann. art.
42.12 (Vernon Supp.  2007); Becker, 33 S.W.3d at 66.  This degree of
discretion extends to revocation proceedings; the trial court has considerable
discretion to modify, revoke, or continue the community supervision.  See Article
42.12, section 21(b); Ex parte Tarver, 725 S.W.2d 195, 200 (Tex. Crim.
App. 1986); Flournoy v. State, 589 S.W.2d 705, 707 (Tex. Crim. App.
1979); Becker, 33 S.W.3d at 66.  The trial court did not abuse its
discretion in revoking Hart=s
community supervision in the three cases.

This
Court=s Ruling

The
judgments of the trial court are affirmed.

 

 

TERRY McCALL

JUSTICE

 

July 31, 2008

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of: Wright, C.J., 

McCall, J., and Strange, J.