

# In the Court of Criminal Appeals of Texas

No. PD-0862-20

ANTHONY RUFFINS,

*Appellant*

v.

THE STATE OF TEXAS

On State's Petition for Discretionary Review
From the Third Court of Appeals
Comal County

YEARY, J., filed concurring opinion.

The Court's rationale in this case is flawed because it applies the principle of estoppel to prevent Appellant's complaint that the accomplice witness instruction given by the trial court improperly

apportioned the burden of proof on that issue, where Appellant did not request the faulty instruction in the first instance. At most he failed to properly object to the erroneous instruction, and that is an insufficient basis to justify estoppel. But I conclude that the Court still correctly affirms the trial court's judgment because the evidence demonstrates that Appellant was not entitled to an accomplice witness instruction at all.

## I. BACKGROUND

Appellant was convicted by a jury of aggravated robbery. His punishment was enhanced by proof of four prior felony convictions. The trial court assessed his sentence at life imprisonment. Appellant's conviction rested in part on testimony from two witnesses: one, whom both parties agree was an accomplice as a matter of law; and another, whom Appellant contended was also an accomplice, but for whom the trial court submitted an instruction permitting the jury to decide whether he was, in fact, an accomplice—what is known as an "accomplice-in-fact" jury instruction.

On appeal, Appellant argued, among other things, that the accomplice-in-fact jury instruction was defective. He complained that, before the instruction required the witness's testimony to be corroborated, it required the jury to determine that he was an accomplice *beyond a reasonable doubt*. Although Appellant effectively withdrew his trial level objection to the jury instruction on this basis,[1]

---

[1] The court of appeals observed that, after "the State finished reading that part of the charge, Ruffins stated that he was 'good' and did not provide further argument on the issue." *Ruffins v. State*, 613 S.W.3d 192, 198 (Tex. App.—Austin 2020). The Court also concluded that, "by informing the trial

the court of appeals nevertheless agreed with Appellant that the instruction was flawed, and that it caused him "egregious harm" under *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). *Ruffins v. State*, 613 S.W.3d 192, 204 (Tex. App.—Austin 2020). The court of appeals therefore reversed Appellant's conviction, over the dissent of one of the justices on the panel. *Id*. at 204–17 (Goodwin, J., dissenting).

The Court granted the State's petition for discretionary review to address four grounds for review. The State alternatively argues in those grounds that: (1) the court of appeals erred to conclude that Appellant suffered egregious harm; (2) Appellant invited the instruction and therefore should not have been heard to complain about it on appeal; (3) the instruction was harmless because there is no evidence in the record to show that the witness was an accomplice in any event; and (4) the instruction was not erroneous to begin with. The Court now resolves the case based on the State's second argument—estoppel by invited error—and improvidently grants the remaining grounds for review. But I disagree that Appellant is estopped from complaining about the accomplice witness instruction on appeal, and for that reason I cannot join the Court's opinion.

Instead, I would sustain the State's third ground for review. I would reverse the judgment of the court of appeals, and remand for disposition of Appellant's remaining points of error. For that reason, I concur in the Court's judgment.

---

court that he was 'good' and by failing to further object to that portion of the jury charge, Ruffins effectively withdrew his objection to that part of the charge." *Id*.

## II. INVITED ERROR/ESTOPPEL

As I understand the doctrine of estoppel by invited error, a party has to request the trial court to take some specific action, have the trial court accede to that request, and then complain on direct appeal that the trial court took that specifically requested action. *See Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999) ("Just as the law of entrapment estops the State from making an offense of conduct that it induced, the law of invited error estops a party from making an appellate error of an action it induced."). It does not appear to me that this is what happened in Appellant's case at all.

The Court's opinion sets out the jury instruction colloquy, and I repeat it here in a footnote.[2] Suffice it to say that I do not believe it

---

[2] The following exchange occurred in the trial court:

[**DEFENSE COUNSEL**]: You know what, I just thought of something. I'm sorry, Judge. I still think that, with a question of fact, that the instruction "therefore, if you believe"—the application instruction, "therefore, if you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witness"—in this case it would be David Hogarth—"was an accomplice or you have a reasonable doubt whether he was or was not as the term is defined in the foregoing instructions, then you cannot convict the Defendant upon the testimony of—unless you further believe that there is other evidence in the case outside of testimony of David Hogarth tending to connect the Defendant with the offense charged in the indictment." And then, "From the all the evidence, you must believe beyond a reasonable doubt that the Defendant is guilty"—

. . . (bailiff reports presence of all twelve jurors returning from break)

reflects that Appellant induced the trial court to commit the specific error he later claimed on direct appeal. His counsel certainly did not *ask for* the instruction that was given. *It was already there*!

---

[**DEFENSE COUNSEL**]: —because there is nothing in the charge that gives them an instruction with respect to how they determine someone is an accomplice, and it has to be done with "if you have a reasonable doubt or not," in that respect.

. . . .

**COURT**: And it says in there they have to find that he is an accomplice beyond a reasonable doubt.

. . . .

[**DEFENSE COUNSEL**]: But I don't think there's been an instruction that they need to believe—when they consider accomplice, they have to agree beyond a reasonable doubt that he is an accomplice. I don't think that's in here.

**COURT:** I thought it was.

[**DEFENSE COUNSEL**]: Unless I'm wrong. I mean, I—let me see here. I don't—I don't see it.

[**STATE**]: "If you find beyond a reasonable doubt that David Hogarth is an accomplice to the crime of aggravated robbery, you must consider whether there is evidence corroborating the testimony of David Hogarth. The Defendant, Anthony Ruffins, cannot be convicted on the testimony of David Hogarth, unless that testimony is corroborated."

[**DEFENSE COUNSEL**]: I'm good.

**COURT**: Okay.

Majority Opinion at 6−8.

Moreover, when counsel initially expressed his concern to the trial court, he was clearly trying to alert the trial court that the instructions failed to explain that, if the jury had a reasonable doubt about whether the witness was an accomplice, it should resolve that doubt in favor of Appellant.[3] It is true that Appellant's counsel then said, "I don't think there's been an instruction that they need to believe—when they consider accomplice, they have to agree beyond a reasonable doubt that he is an accomplice." But at that point, both the trial court and the State corrected him, and they assured him that the charge did, in fact, require a beyond-a-reasonable-doubt finding about the witness's status as an accomplice. It is also true that counsel thereafter expressed apparent satisfaction, saying "I'm good." But I agree with the court of appeals that this constituted, at most, only a procedural default of his complaint that the burden was misallocated, so as to require application

---

[3] The italicized part of the following short excerpt illustrates my point about what counsel was actually asking for when he supposedly invited the court to include the arguably erroneous instruction:

> [**DEFENSE COUNSEL**]: "therefore, if you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witness . . . was an accomplice *or you have a reasonable doubt whether he was or was not as the term is defined in the foregoing instructions, then you cannot convict the Defendant upon the testimony of—unless* you further believe that there is other evidence . . . tending to connect the Defendant with the offense charged in the indictment." And then, "From the all the evidence, you must believe beyond a reasonable doubt that the Defendant is guilty"—

Majority Opinion at 6−7 (emphasis added).

of *Almanza*'s "egregious harm" standard, assuming that the instruction was erroneous.

As I understand the exchange, Appellant's counsel allowed himself to be misled into believing that the reasonable-doubt instruction already included in the charge properly allocated the burden in just the way he had already mentioned and would later complain about on appeal. But he did not *invite* the trial court to include the instruction that the trial court gave. And for that reason, I do not believe the court of appeals erred by declining to invoke the doctrine of estoppel by invited error on these facts.

The Court also disclaims any reliance on "invited error," *per se*, as the operative theory of estoppel in this case, invoking instead what it calls "judicial estoppel." Majority Opinion at 12. Put aside that it is not even what the State itself has argued in its second ground of review in this Court—the State complained of estoppel by invited error. The Court concludes that Appellant is estopped because "at the very least" he had "some responsibility" for the error he now complains about. *Id.* at 13 (citing *Woodard v. State*, 322 S.W.3d 648, 659 (Tex. Crim. App. 2010)). Whatever its provenance,[4] too liberal an application of this amorphous

---

[4] *Woodard* cites *Trejo v. State*, 280 S.W.3d 258, 260 (Tex. Crim. App. 2009), which in turn cites *Tucker v. State*, 771 S.W.2d 523, 534 (Tex. Crim. App. 1988). *Woodard*, 322 S.W.3d at 659. *Tucker* is a quintessential invited-error/estoppel case. *See Tucker*, 771 S.W.2d at 534 ("It is well established that when a defendant requests a charge, and the court submits it, he can not complain of that charge on appeal."). Both the *Trejo* Court and the Court today also cite *State v. Yount*, 853 S.W.2d 6, 9 (Tex. Crim. App. 1993). 280 S.W.3d at 260; Majority Opinion at 11. In *Yount*, as well, the appellee had specifically requested that the trial court submit the jury charge he thereafter complained about on appeal. *See* 853 S.W.2d at 9 ("Since appellee requested that the jury be instructed on the lesser included offense, he is now estopped from

"at least . . . some responsibility" notion of estoppel can only serve to undermine *Almanza*'s construction of Article 36.19, which requires appellate review of erroneous jury instructions even when the alleged error has been procedurally defaulted—albeit under the more rigorous "egregious harm" standard.

To simply declare that an appellant is "estopped" from claiming jury charge error because, by rescinding his previous objection, he bears "at the very least . . . some responsibility" for that error, is to judicially incapacitate that aspect of the statute that guarantees that a defendant has had "a fair and impartial trial," as construed by *Almanza*. *See* 686 S.W.2d at 171 ("[I]f no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short, 'egregious harm.'"). I am not prepared, at this time, to do that.

I would not sustain the State's second ground for review. However, I would reach the same bottom line that the Court does today based on my own evaluation of the State's third ground. I would conclude that the evidence failed to raise an issue whether the witness was, in fact, an accomplice, rendering any deficiencies in the accomplice witness instruction "inapposite."

### III. THE ACCOMPLICE WITNESS INSTRUCTION

### A. The Law of Accomplice Witnesses

Article 38.14 of the Texas Code of Criminal Procedure provides:

---

complaining that his conviction of that offense is barred by limitations."). All these cases seem to apply an "invited error" theory of estoppel, not some amorphous "judicial estoppel" principle, as the Court suggests today.

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. art. 38.14. The Court has said that an accomplice is one who "participates with a defendant before, during, or after the commission of a crime and acts with the requisite culpable mental state." *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). "A witness is not deemed an accomplice [merely] because he knew of the crime and failed to disclose it or even concealed it." *Smith v. State*, 721 S.W.2d 844, 851 (Tex. Crim. App. 1986). There must, instead, be some evidence of an affirmative act on the part of the witness to assist in the commission of the charged offense. *Druery v. State*, 225 S.W.3d 491, 499 (Tex. Crim. App. 2007).

Even a witness who may have participated with the principal actors in planning for or committing only a *different* offense—different than the one on trial—likewise does not, by that act alone, make himself an accomplice to the offense on trial. *See Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987) ("If a State's witness has no complicity in the offense for which an accused is on trial, his . . . testimony is not that of an accomplice witness whatever may have been his complicity with the accused in the commission of other offenses."). Similarly, acting only as an accessory after the fact—in essence, playing no part in the offense, but helping to cover it up once it has been committed and completed—does not alone suffice to make a witness an accomplice, at

least not to the offense that is covered up. *Easter v. State*, 536 S.W.2d 223, 229 (Tex. Crim. App. 1976).

Any witness who has definitively been shown to have participated in the same offense (or a lesser included offense) for which the accused is on trial—for example, any witness who has also been indicted for, or even already been convicted of, the same offense—is regarded as an accomplice as a matter of law. *Cassanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012). Under those circumstances, the trial court is required to instruct the jury that, before it may consider the testimony of such a witness, it must determine that the witness's testimony is corroborated by "other evidence tending to connect the defendant" to the alleged offense. *Id*. But sometimes the evidence is less definitive about whether a witness participated in the offense for which the accused is on trial; the evidence may even conflict in that regard.

In the event that the evidence is less definitive of the witness's participation in the offense, the jury must be instructed first to determine whether that witness was in fact an accomplice. Only if the jury finds him to be an accomplice must it then require his testimony to be corroborated. *Paredes*, 129 S.W.3d at 536. Whether an accomplice-as-a-matter-of-fact instruction must be submitted is to be determined on a case-by-case basis. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). Even when an error with regard to an accomplice-as-a-matter-of-fact instruction has occurred, this Court has applied the harm rubric established in *Almanza* to determine whether the error should result in reversal. *Medina v. State*, 7 S.W.3d 633, 642 (Tex. Crim. App. 1999). And the Court has decided that flaws in an accomplice-as-a-matter-of-fact

instruction are rendered "inapposite" when an instruction is given in the absence of evidence that would justify a finding that the witness was, in fact, an accomplice. *See Druery*, 225 S.W.3d at 500 ("Druery's arguments concerning accomplice witness instructions given to or not given to the jury and concerning the application of the accomplice witness rule to the underlying predicate felony offense are inapposite.").

## B. The Facts

Appellant was charged with committing aggravated robbery, in May of 2016, at a tattoo shop in New Braunfels called Timeless Ink. Four codefendants were also charged: Augustus ("Gus") Trevino, Olanda Taylor (also known as "Tazz," Appellant's cousin), Robert Ruffins (also known as "Robbie," Appellant's brother), and Kenneth McMichael (also known as "Redd"). Trevino testified at Appellant's trial, and by that time, he had already been convicted of aggravated robbery for the same offense. The jury was therefore correctly instructed that it could not rely upon his testimony absent corroboration. Appellant claimed, however, that a second witness, who was never indicted for the offense, was also shown at trial to have been an accomplice as a matter of law: David Hogarth.

Surveillance footage from security cameras in the tattoo shop showed that four men entered the shop late at night, wearing masks, head coverings and gloves, and carrying handguns. At that time there were two employees and one customer inside the tattoo shop. Based on the video footage and the testimony of Sarah Zamora—one of the employees of the tattoo shop—the men entered the upstairs area of the tattoo shop and brutally assaulted the other employee and customer who

were present. Zamora was kicked in the face, and then directed at gunpoint to retrieve the cash register and safe kept in the shop. The robbers then stole the victims' wallets and cell phones and left. None of the victims were able to identify any of the robbers.

At trial, Trevino, testifying as an accomplice witness, explained that he had already been convicted for his part in the tattoo shop robbery and that he was testifying pursuant to an agreement with the State. His cousin was the owner of the tattoo shop.[5] The plan to rob the tattoo shop formed because the robbers, each of whom he identified, were "in need of money basically at the time."[6]

A few days prior to the robbery, Trevino and Taylor traveled from San Antonio to New Braunfels to drive by the tattoo shop on a scouting mission. Trevino testified that Hogarth "just happened to be in the car" at that time. Hogarth did not take part in the planning, according to Trevino, but instead only overheard the conversation between Trevino and Taylor. Nor was Hogarth present for the actual robbery, although he was present when the robbers left to go commit it. Trevino also testified that, prior to the tattoo shop robbery, Hogarth had suggested

---

[5] Because Timeless Ink belonged to Trevino's cousin, Trevino did not go into the tattoo shop during the robbery but acted as lookout and getaway driver.

[6] Trevino described Hogarth's role in this way:

Q.     And how did David factor into all of this? Was he part of this planning as well?

A.     No, he wasn't really in the plan. He was more like a -- just a hang-around type of guy.

that they commit a different robbery or burglary, but that suggested crime ultimately "didn't happen" for undisclosed reasons.[7]

Trevino acknowledged on cross-examination that, after the robbery, he contacted Hogarth to discourage him from cooperating with police and encourage him to "get a lawyer." Trevino agreed with defense counsel that, because Hogarth had been in the car when they scouted the tattoo shop, he also "had some exposure" in the case and could be guilty as a party to the robbery.[8] On re-direct, Trevino insisted that

---

[7] Trevino testified about this inchoate offense on direct examination: "Well, before [the tattoo shop robbery], we had went to -- David [Hogarth] had told us about somebody that he knew they were getting Klimax from. And we went over there and tried to get into his place, and that didn't happen."

[8] Trevino's testimony proceeded as follows:

Q.     So you told David he needs to hire a lawyer, didn't you?

A.     To get him a lawyer, yeah.

Q.     Because you knew that David had some exposure in this case; isn't that right?

A.     Yeah.

Q.     Because he had gone with you to scope out that place; isn't that right?

A.     He was with me in the car --

Q.     He was with you in the car when you scoped out the place, right?

A.     When we drove by.

Q.     Yes, right? So you know about the law of parties, right?

A.     Yes.

Hogarth never directed, solicited, encouraged, aided, or attempted to aid anyone in the commission of the tattoo shop robbery. He explained that he had suggested Hogarth retain a lawyer because he knew Hogarth had knowledge of the robbery and hoped a lawyer would deflect the police investigation. Trevino did not expect Hogarth to be arrested for the robbery.

Two detectives with the New Braunfels Police Department testified about their investigation of the robbery. Richard Groff was the

---

Q.     Somebody drives someone to a bank and that person goes and does the bank robbery, another person, the driver is just as guilty as the --

A.     Yeah, yeah.

Q.     So David Hogarth, under the law of parties, is just as guilty as all of you; isn't that right?

A.     Yeah.

[PROSECUTOR]: Judge, I would object. What he's testified to is that David Hogarth was merely present, and that specifically does not make him a party under the law of parties.

(Bench conference.)

THE COURT: Calling for a legal conclusion from the witness.

[DEFENSE COUNSEL]: But I asked him if he knew what law of parties was, and he said "Yes."

THE COURT: Yeah. Well --

[DEFENSE COUNSEL]: And they didn't object.

THE COURT: Yeah, I know. I think you're just going to have to clean it up on redirect, because I think you're – you're confusing the two -- the two incidents, the driveby and then the actual robbery. And you're starting to blur. So I am going to overrule the objection.

on-call detective when the robbery occurred and testified about the initial stages of the investigation. When he discovered that two of the victims' cell phones had been taken, Groff used the "Find My iPhone" function to locate Zamora's cell phone in an apartment complex in San Antonio. The woman who had the phones in her possession told Groff that Taylor had given them to her. The police found a safe that was "consistent with" the one stolen during the robbery in a dumpster at the apartment complex. Taylor was arrested for a separate offense, and he provided additional information that assisted in the investigation of the tattoo shop robbery.

Detective John Mahoney testified extensively about the entire investigative process, describing how he determined who was involved in the robbery. A review of surveillance footage from nearby businesses showed a distinctive white Volvo driving in the direction of the tattoo shop shortly before the robbery. Mahoney determined that Trevino owned the Volvo. Mahoney also examined Taylor's Facebook page, and this led him to uncover additional suspects in the robbery—Appellant, Robert Ruffins, and McMichael.

Appellant's Facebook page revealed that his nickname is "Poohbear." Mahoney testified that, from the audio of the surveillance footage, toward the end of the incident, he thought he could hear one of the robbers say, "[l]et's go, let's go, Poohbear" or "[l]et's go, Pooh." Appellant's Facebook page also revealed photographs of Appellant, Robert Ruffins, and Taylor, all three at various times wearing a white hat that looked like one worn by one of the robbers. Appellant commented on a Facebook photo of McMichael: "Boss of all boss, what's

popping, little bro? I see you got my shooter with you." This comment was followed by emojis and symbols of guns. He also commented: "Oh, yeah, for y'all fuckboy, if you ain't fam you food." This was followed by more emojis and symbols of guns, knives, and money.

During the investigation, Mahoney discovered that Hogarth likely had relevant information regarding the robbery. Initially, Hogarth was deceptive and uncooperative with police. He said he would provide Mahoney his cell phone, but ultimately did not, and Mahoney eventually had to obtain a search warrant for it instead. Moreover, somebody whom Mahoney believed to be Hogarth had reportedly told Trevino's wife, "Don't say anything"—presumably to the police. Mahoney believed Hogarth had been threatened by Appellant and was afraid to tell the truth. Eventually Hogarth told Mahoney that he had gone to the tattoo shop with Taylor and Trevino several days prior to the robbery, but that he had not known when they left that it was a scouting mission.[9] Mahoney ultimately concluded that Hogarth was not involved

---

[9] On cross-examination, defense counsel tried, without success, to get Mahoney to concede that Hogarth was a party to the robbery by virtue of this scouting mission:

> Q.    . . . So at this time did you already know that David Hogarth and Gus Trevino and Tazz went out to look at the tattoo location? Had you already known that?
>
> A.    No.
>
> Q.    And was it David Hogarth that told you that?
>
> A.    Yes.
>
> Q.    And he minimized that, didn't he?
>
> A.    What do you mean?

Q. He tried to tell you that he was not -- he didn't know anything about going to do a robbery or anything like that, he just went for a ride.

A. He told us that he was asked -- at first he described it as going for a ride, then he made it clear to us that by the time they finished their ride and got back to San Antonio he had been asked to participate in a robbery at that location.

Q. Sure. Are you familiar with the law of parties?

A. Yes. Well, not an expert, but yes.

Q. In a nutshell, from your experience, what does that mean?

A. Someone who is a party to an offense by being the getaway driver or the lookout or whatever can be charged with the offense.

Q. Or helped plan?

A. I can't testify to -- that I am familiar with the exact wording of the law.

Q. Would it help you if you looked at it?

A. Sure.

[DEFENSE COUNSEL]: May I approach, Your Honor?

THE COURT: Yes.

Q. (By [Defense Counsel]): I am going to show you part of the Penal Code, and it's in the Texas Criminal Code clause, subchapter A, complicity 7.01, parties to an offense, and 7.02, criminal responsibility for conduct of another. Have you ever looked at that before?

A. Yes, I looked at this before.

Q. Okay. Could you refresh your memory on that?

A. Sure.

Q.      Take all the time you need.

A.      Is it okay if I keep this with me while you ask me questions about it?

Q.      I'm going to be needing it, so let me see if I can find you another -- this is just in page form, but it's identical to what I just showed you.

A.      All right. I think I'm ready to answer your questions now.

Q.      Okay. So I asked you, if someone plans a crime, would they be a party?

A.      I don't see the word "planning" anywhere here in this statute, and I don't have any information that David Hogarth planned a robbery.

Q.      Okay. Look at 7.02, he promotes or assists in the commission of the offense.

A.      A or B?

Q.      Under (A)(2), 7.02, criminal responsibility for conduct of another.

A.      Okay.

Q.      Acting with the intent to promote or assist in the commission of the offense, he solicits, encourages, directs, or attempts to aid the other person to commit the offense.

A.      Okay.

Q.      So, hypothetically speaking, if somebody goes to a location that some --

[PROSECUTOR]: Judge, I'm sorry. I am going to object to a hypothetical. This witness is not an expert.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Well, I think he testified he's familiar with the law of parties.

THE COURT: Well --

[PROSECUTOR]: So is the jury. Judge, the issue is this is not an expert. If anything, he would offer a lay opinion. Ultimately, it's going to be a question for the jury, who has received the law and will receive it again from the Court.

[DEFENSE COUNSEL]: I will accept his lay opinion. That's fine. But he is a peace officer. I mean --

[PROSECUTOR]: If the witness feels comfortable answering, I'm fine. I just don't want to put him in a position where he's being asked to give an expert legal opinion on something if he's not comfortable with it.

THE COURT: Well, it's a lay opinion.

[DEFENSE COUNSEL]: Thank you, Judge.

THE COURT: All right. What's the question?

Q. (By [Defense Counsel]): Would you agree with me that – let's just do it this way: If somebody drives someone to a bank, even though they didn't do the bank robbery, and they know that the bank robbery is going to occur, would they be a party to an offense?

A. Are you talking about the driver or the passenger?

Q. I am talking about the driver.

A. Someone drives to a bank --

Q. And somebody else, not the driver, but someone else does the bank robbery. In other words, he's taking the person who actually did the robbery. Is the driver a party?

A. During the planning process or during the bank robbery?

Q. During the bank robbery.

A. Sure, the driver could be a party to the offense.

Q. Okay. Let's -- let's add another fact situation to that. Let's assume that three people get together and they decide

that they're going to rob a bank, right? So one of the planners doesn't go. The driver goes and the person who actually did the robbery go. The driver, as you testified, is a party, right?

A.      Yes.

Q.      The planner also is a party; isn't that correct?

A.      I think, if I was investigating a case like that, I would ask the question of -- about the discussions that happened during the planning and whether the person said anything that promoted the robbery.

Q.      Well, if you're planning the robbery, that's promoting the robbery. Wouldn't you agree?

A.      Sure. But I would want to know what they said and what they did. I would need to be able to prove that.

Q.      Sure. So if somebody is scouting out, doing a dry run of a robbery, right, that's doing an overt act to assist in that robbery, wouldn't you agree?

A.      I am having trouble drawing a parallel between what you're describing and my -- what came of my investigation in this case.

Q.      I'm not -- I'm just giving you a hypothetical still. If someone is doing a dry run of a robbery, they're planning it and they go out there and take a look, look at the location, how far it is -- away it is, how long it's going to, you know, take to get there, what are the exits they are going to leave from, things of that sort, if they are planning that robbery and they do that, that's an overt act, correct?

A.      That would absolutely be something that I would want to know about that I would want to investigate. I have never arrested anyone for something like that.

Q.      Understood. And so you received information from David Hogarth that he, Tazz, and Gus went to the tattoo parlor, right?

in, did not encourage anyone to participate in, and did not aid or attempt to aid in, the commission of the tattoo shop robbery.[10]

Hogarth himself testified that he did not participate in the robbery of the tattoo shop, while also admitting that he did nothing to prevent it from occurring. He further testified that he did not realize on

---

A.      Yes.

[10] Mahoney's re-direct testimony began this way:

Q.      Detective Mahoney, did you, during the course of your investigation, ever come across any evidence from any source that led you to believe that David Hogarth had solicited anybody to participate in an aggravated robbery of Timeless Ink?

A.      No.

Q.      Did you come across any evidence whatsoever that David Hogarth ever encouraged anybody to participate in an aggravated robbery of Timeless Ink?

A.      No.

Q.      How about whether or not David Hogarth ever directed anybody to participate in a robbery of Timeless Ink?

A.      No.

Q.      Any evidence that he ever aided or attempted to aid anyone in the commission of a crime?

A.      No.

[DEFENSE COUNSEL]: Objection, Your Honor. That's contrary to the evidence in this case. It's --

[PROSECUTOR]: Judge, he's asked for his opinion multiple times on this topic.

THE COURT: It's for the jury to determine, [Defense counsel].

the way to New Braunfels that the purpose of the trip was to scout the tattoo shop, and only learned about it when Trevino mentioned wanting to do "a lick" at some point in the car.[11] He denied going into the tattoo

---

[11] Hogarth's testimony on cross-examination was as follows:

Q.     And [the car trip to New Braunfels] essentially was a scouting mission for Gus and Tazz and you to do this robbery in New Braunfels, wasn't it?

A.     Yes, sir.

Q.     And so you did something in furtherance of this robbery, didn't you? You scouted it out with those two guys, didn't you?

A.     I don't -- I --

Q.     Answer the question. Didn't you do that?

A.     No, sir.

Q.     You didn't go with them to look at the tattoo parlor and see where it was? You didn't do that?

A.     Well, yes, we went, but we didn't go --

Q.     Okay.

THE COURT: All right. Now, court reporter can only take you one at a time. Ask the question, let the witness answer, then ask another one. Don't start talking over each other.

[DEFENSE COUNSEL]: Yes, sir.

Q.     (By [Defense Counsel]:) Let's be clear, because the State asked you about this. It was you and Tazz and Gustavo who went to New Braunfels to scout out the tattoo parlor; isn't that right?

A.     Yes, sir, but he said we were going to go visit his cousin.

Q.     Sure. And that's the cousin he was going to rob; isn't that right?

A.      Yes, but I didn't know we were going to rob them 'til we got there to New Braunfels, he said it.

Q.      And -- but that was one week before; isn't that right?

A.      Yes, sir.

Q.      And at that time you knew that there was -- they were going to do a lick on that tattoo parlor; isn't that right?

A.      Yes, sir.

Q.      And you didn't do anything to prevent that from happening, did you?

A.      No, sir.

Q.      You didn't call the police, even though you knew that you and they were going to do a robbery; isn't that right?

A.      Yes, sir.

Appellant's counsel also questioned Detective Mahoney whether he believed Hogarth had admitted being aware of the plan to rob the tattoo shop at the outset of the scouting mission:

Q.      Okay. So David Hogarth told you, during your investigation, that he didn't learn that they were going to do a lick, until after they were leaving the tattoo parlor on that first dry run?

A.      Correct. He said that his impression was they were just going for a ride, until after they had been to the tattoo shop. And maybe sometime driving back is when Gus told them the plan to do a robbery.

Q.      If David Hogarth testified that he knew about that robbery and he was doing the dry run with them ahead of time, he didn't tell you that, did he?

[PROSECUTOR]: Judge, I am going to object. That mischaracterizes his testimony.

[DEFENSE COUNSEL]: The jury heard it. I asked him, "Did you know that they were going to do the robbery?"

shop when they drove by to scope it out. Instead, he claimed he went to a corner store to get a drink. He was present during later conversations between Appellant, Taylor, Robert Ruffins, and Trevino when they made their plans to commit the robbery, and he considered joining them. But he insisted that, once he learned about the plan for the robbery of the tattoo shop, he did not ultimately solicit or encourage anybody to partake in, direct anybody to commit, or himself aid in the commission of, the robbery in any way. He claimed to have avoided speaking to detectives about the robbery because he feared for his life and his family's life, having been threatened by Appellant should he ever talk about the robbery. He identified Appellant as being among the robbers as depicted on the store surveillance video.

When Appellant was eventually interviewed about the robbery, he denied having any involvement. However, Appellant made strange comments during the interview, such as, "If you say I did it, I did it. If you say it's me, it's me." Appellant did not react when he was shown the

---

THE COURT: The jury can recall. I -- you know, it was a while back.

[DEFENSE COUNSEL]: Let me rephrase it another way. Can I rephrase?

THE COURT: Yes.

Q.      (By [Defense Counsel]): If David -- if you were to learn that David Hogarth said he knew that they were going to plan the robbery ahead of time and that he went out there with them to take a look, if that's the scenario, would you consider him to be a party?

A.      I would need to do further investigation to label him as a party to the offense.

surveillance footage of the robbery. Appellant claimed that he was with his girlfriend on the night of the robbery, but he would not identify her to police. Shante Benton, Appellant's girlfriend, was the sole defense witness. She testified that Appellant was with her when the robbery occurred. She remembered that night specifically because her daughter's birthday was the next day, and they had planned her birthday party and then gotten ready for bed and watched movies.

The trial court submitted an instruction to the jury requiring it to determine whether Hogarth was in fact an accomplice, and also to require corroboration for his testimony as well, should it find him to be so. It also instructed the jury—twice, in fact—that, if it found Hogarth also to be an accomplice, his testimony and Trevino's could not be considered as mutually corroborative. In submitting the accomplice-as-a-matter-of-fact instruction, the trial court informed the jury that it need not find Hogarth to be an accomplice unless it was convinced that the evidence proved him to be an accomplice "beyond a reasonable doubt." This was the flaw that Appellant complained about on appeal, causing the court of appeals to reverse his conviction.

## B. Analysis

There is no evidence that Hogarth was a principal actor in the tattoo shop robbery. If he was an accomplice witness, it must have been established by virtue of vicarious liability under Section 7.02(a)(2) of the Penal Code, for having solicited, encouraged, directed, aided, or attempted to aid others in its commission. TEX. PENAL CODE § 7.02(a)(2). But Hogarth was not present when the robbery was committed, so there is no evidence, direct or circumstantial, that he committed any

affirmative act to promote the offense as it was being perpetrated.[12] If he had any criminal liability for the tattoo shop robbery at all, it must have been because of some affirmative act or acts committed before or after that offense.

The State argues that there is no evidence of any affirmative act that would amount to solicitation, encouragement, direction, or aid in commission of the tattoo shop robbery. Appellant argues that there was at least circumstantial evidence from which the jury could rationally

---

[12] Appellant also argues that the so-called "party-conspirator theory" embodied in Section 7.02(b) of the Texas Penal Code also applies. *See* Appellant's Brief at 46 (citing *Zamora v. State*, 411 S.W.3d 504, 512 (Tex. Crim. App. 2013), which held that accomplice witness rule of Article 38.14 includes "the party-conspirator theory" of parties contained in Section 7.02(b)). Section 7.02(b) reads:

> (b)  If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE § 7.02(b). The trial court also submitted this theory of parties to the jury in this case. But Appellant does not explain in what way the evidence raised this conspiracy-based theory of parties. For example, he does not identify what underlying felony Hogarth had conspired to commit when the aggravated robbery with which Appellant was charged was committed; nor does he explain how that aggravated robbery was committed in furtherance of whatever that underlying felony might have been that Hogarth conspired to commit. *See Paredes*, 129 S.W.3d at 539 (holding that, for a Section 7.02(b)-based accomplice-witness instruction to be applicable, "there would still need to be evidence that [the witnesses] were conspirators in carrying out one felony when another was committed"). The court of appeals did not address this theory of criminal responsibility under the accomplice-witness rule, and neither shall I.

infer that Hogarth committed affirmative acts before and after its commission that promoted the offense. But the direct evidence is to the contrary.

When specifically asked whether Hogarth did anything leading up to or following the tattoo shop robbery to promote its commission, Hogarth himself, along with Trevino and Mahoney, all denied that he did. It is true that, at several points in his testimony, Hogarth at least seemed to admit that he had participated in the scouting mission prior to the robbery.[13] But subsequent testimony clarified that he was testifying from hindsight on those occasions, and that as of the time the trio set out on the scouting mission, Hogarth was unaware of the purpose of, and was merely present during, that trip.[14] There is no direct testimony that he committed any affirmative act to promote the robbery during that excursion. There is likewise an absence of evidence that he played any active part in any subsequent planning among the robbers; all that the record reveals, including Trevino's testimony, is that Hogarth was merely present for that as well.

---

[13] For example, Hogarth simply answered "Yes, sir" when asked the compound question on cross-examination: "that essentially was a scouting mission for Gus and Tazz and you to do this robbery in New Braunfels, wasn't it?" *See* note 11, *ante*. At another point, during Hogarth's earlier direct examination, the prosecutor asked him, "So who were -- who was -- who were you planning to rob when you were going to hit that lick?" Hogarth answered, "Gustavo's -- Gus's cousin." But, of course, Hogarth did not accompany the robbers when they went to "hit that lick." By the time the robbers departed to carry out the robbery, it is uncontested that Hogarth was aware of their intentions. Trevino even testified that Hogarth seemed disappointed when the robbers "left without" him. But Trevino denied that Hogarth played any part in either the planning or the execution of the tattoo shop robbery.

[14] *See* notes 9–11, *ante*.

The record does reveal that Hogarth both failed to disclose his knowledge of the plan to rob the tattoo shop beforehand and that he was evasive and deceptive with the police during their investigation afterwards. In isolation, however, none of these circumstances establishes an affirmative act sufficient to render him an accomplice witness. *See Smith*, 721 S.W.2d at 851 (that a witness was present at the murder, suggested where to dispose of the deceased's body, and helped with the disposal, did not make him an accomplice); *Medina*, 7 S.W.3d at 642 (even a witness who is only present for, or who later helps conceal, an offense is not, absent more, an accomplice). Indeed, in *Medina*, this Court observed that a witness named Juarez was a member of the same gang as the defendant, the murder was gang-related, and Juarez helped to conceal the murder afterwards. *Id*. But, observing that there was no evidence that Juarez was present when the murder was committed, the Court held that these other circumstances were not enough to make him an accomplice witness at the murder trial. *Id*. Hogarth was likewise not present for the tattoo shop robbery; his failure to disclose it beforehand or to report it afterwards does not make him an accomplice.

Appellant argues that the jury could nevertheless have inferred from the *totality of circumstances* that Hogarth was an accomplice. In addition to the afore-mentioned circumstances—his presence on the scouting trip and during the planning of the robbery, and his failures to disclose it before, or report it after, to the police—Appellant also points to testimony that Hogarth was involved in a different offense that the robbers tried to perpetrate on the same night as the tattoo shop

robbery.[15] Of course, an affirmative act to commit a different offense, other than the one on trial, does not make a witness an accomplice. *Gamez*, 737 S.W.2d at 322.

Still, Appellant argues that, under the "doctrine of chances," the fact that Hogarth would involve himself in the planning of one offense makes it more likely he was actively involved in the planning of another. *See De La Paz v. State*, 279 S.W.3d 336, 347 (Tex. Crim. App. 2009) ("The 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves inadvertently or by happenstance."). Appellant maintains that the fact that Hogarth refused at first to cooperate with—and even impeded—the police investigation demonstrates a consciousness of guilt, which he asserts is another circumstance tending to show that Hogarth was a party to the charged offense. *See Ruffins*, 613 S.W.3d at 202 n.2 ("This [consciousness-of-guilt] evidence raises an issue as to whether Hogarth performed an affirmative act promoting the commission of the aggravated robbery with the requisite intent when he went to the tattoo shop with Taylor and Trevino."). From the totality of these circumstances, Appellant insists, the jury could have rationally inferred that Hogarth solicited, encouraged, directed, aided, or attempted to aid in the commission of the tattoo shop robbery.

But, even in the aggregate, the circumstances of this case do not show that Hogarth engaged in an affirmative act to promote the tattoo shop robbery—any more than the combined circumstances in *Druery*, or

---

[15] *See* note 7, *ante*. Although his testimony was vague on this point, Trevino seems to have asserted that a different robbery or burglary was contemplated earlier that night, of a drug-dealing victim that Hogarth knew of and may have proposed to the group.

in *Kunkle v. State*, 771 S.W.2d 435 (Tex. Crim. App. 1986), sufficed to establish that the witnesses in those cases engaged in affirmative acts that made them accomplices.[16] Indeed, in each of these cases, the witness was at the scene when the charged offense was committed. But even in the face of additional circumstances analogous to those in this case, this Court held that the evidence failed to establish that the witnesses were accomplices. Appellant does not argue that *Druery* or *Kunkle* were wrongly decided or that the Court should overrule them.

In *Druery*, the appellant argued that the two witnesses who had been with him when he committed the offense were accomplices. One of the witnesses had driven to the location where the murder occurred, and both witnesses had been told that Druery intended to kill the victim, though neither then warned the victim. 225 S.W.3d at 500. At least one of the witnesses helped Druery to dispose of the body and the murder weapon, and both witnesses accepted money from Druery after the offense. *Id*. These circumstances, the Court held, did not raise a fact issue whether the witnesses were accomplices. *Id*. Importantly, the Court said nothing about the witness's participation in the disposal of the body and weapon as potential evidence of a consciousness of guilt.

In *Kunkle*, the purported accomplice witness had overheard several discussions about robbery prior to the capital murder, but he "did not take part in them." *Kunkle*, 771 S.W.2d at 437. He was present when a *different* robbery was committed at a convenience store phone booth, and he may have acted as a lookout, though he neither participated nor shared in the proceeds. *Id*. He was later present in the

---

[16] *See* State's Brief on the Merits at 42–51; *see also* text, *post*.

car when the charged robbery/murder was committed. *Id*. at 438. Afterwards, he was afraid to contact the police, but he did attend a lake outing the next day "with the others" that was paid for with proceeds from the capital offense. *Id*. The Court concluded:

> Even if [the witness] knew about the prior robbery, failed to abandon the group, permitted [the capital murder victim] to be induced into entering the vehicle, and would have told the others (but did not) if he saw police, he would not be shown to have committed an *affirmative* act in order to assist the murder. In the absence of such an act, he cannot be an accomplice, even as a matter of fact.

*Id*. at 441.

The Court also observed in *Kunkle* that "any connection [the witness] had with the robbery of the man at the convenience store would not render him an accomplice witness to [the capital murder] in the absence of some evidence showing [his] complicity with the commission of the [capital] murder." *Id*. Again, the Court did not consider the witness's reluctance to call the police as a consciousness-of-guilt factor. Nor did it find the prior convenience store robbery to be a circumstance that raised a "doctrine of chances"–type of inference that the witness must have known the robbery/murder would occur, and was a willing participant, because he had just witnessed another robbery. *Id*. If the witnesses in *Druery* and *Kunkle* were determined not to be accomplices, then Hogarth cannot be found to have been an accomplice in this case.

## IV. CONCLUSION

Neither direct nor circumstantial evidence in this case would justify a jury finding that Hogarth was an accomplice witness whose testimony required corroboration. The accomplice-as-a-matter-of-fact

instruction was therefore "superfluous," and any deficiency in it could not have harmed Appellant. *See Druery*, 225 S.W.3d at 497–98. This conclusion renders it unnecessary for me to address the State's remaining grounds for review. Accordingly, I would reverse the judgment of the court of appeals and remand the cause for disposition of Appellant's remaining points of error. I concur in the Court's judgment to do so, even if for a different reason than the Court gives.

**FILED:**                                        March 29, 2023
**PUBLISH**