

## NUMBER 13-23-00471-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

CATARINO VERNON, **Appellant,**

**v.**

THE STATE OF TEXAS, **Appellee.**

### ON APPEAL FROM THE 36TH DISTRICT COURT
### OF SAN PATRICIO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Tijerina and Peña
Memorandum Opinion by Chief Justice Contreras**

Appellant Catarino Vernon challenges his conviction of indecency with a child by exposure, a third-degree felony with punishment enhanced due to habitual felony offender (HFO) status. *See* TEX. PENAL CODE ANN. §§ 12.42(d); 21.11. Vernon argues that (1) the trial court erred in allowing forensic interviewer Penny Green to testify as the State's outcry witness, (2) the court erred in allowing hearsay of the complainant, (3) the

prosecutor made improper jury arguments that resulted in reversible error, and (4) his sentence of forty years' imprisonment violated the Eighth Amendment's prohibition against cruel and unusual punishment. *See* U.S. CONST. amend. VIII. We affirm.

## I. BACKGROUND

The indictment alleged that on or about May 22, 2020, Vernon "with the intent to arouse or gratify [his] sexual desire, expose[d] [his] genitals, knowing that N.M.[1] (pseudonym), a child younger than 17 years of age, was present." The indictment included an HFO enhancement alleging that Vernon was convicted of possession of cocaine with intent to deliver on November 13, 2009, and unlawful possession of a firearm on January 25, 2013.

At the outcry witness designation hearing, the State informed the trial court that it intended to designate Green, a Children's Advocacy Center (CAC) forensic interviewer, as its outcry witness. Defense counsel objected, arguing that Green could not be the State's outcry witness because N.M. first outcried to her mother, B.M. The State responded that the designated outcry witness is the first person to whom the complainant tells detailed allegations of the abuse, including "where she was, how it happened, [and] what she saw," and B.M. was not an appropriate outcry witness because N.M. did not tell her many details about the exposure. After hearing testimony from Green and B.M., the court overruled the defense's objection, and Green was designated as the State's outcry witness. The State informed the court that it still intended to question B.M. about what

---

[1] To protect the identity of the complainant, we refer to her by the pseudonym given to her in the indictment and refer to her family members with pseudonyms. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. CODE CRIM. PROC. ANN. ch. 58, subch. C ("Confidentiality of Identifying Information of Sex Offense Victims").

N.M. told her about the exposure, and the court responded that it would make a ruling when B.M. testified.

At trial, the bulk of the testimony was given by B.M., N.M., and Green. B.M. testified that her family visited Mathis, Texas, in May of 2020 when N.M. was eleven years old. B.M. testified that she lives with her five children in Oklahoma City, but they typically visit Mathis two or three times a year to see family. B.M. said that her family stays with her grandmother during these visits, and Vernon, her father or N.M.'s grandfather, lives nearby with his eighteen-year-old son, Devin.

When asked by the State if N.M. ever told her anything concerning about Vernon in May of 2020, defense counsel objected and argued that the answer would constitute inadmissible hearsay. The State responded that it intended "to have [B.M.] describe [N.M.'s] demeanor," and argued that B.M.'s testimony regarding N.M.'s statement fell under the excited utterance hearsay exception. The court overruled the defense's objection, and the following exchange occurred:

[B.M.]: [W]e were standing in front of the doorway, and [N.M.] looked over and she said, "Mom, I have something to tell you."

[The State]: And at that time what was her demeanor like? What did she look like?

[B.M.]: She was—she said it in a soft, quiet voice. She was like—it was kind of a shaky, scary kind of voice. She said, "Mom, I have something to tell you," like as if, you know, how when you know you messed up . . . . I said, "What?" And she didn't know the exact terminology, the correct words to say, but she was like, you know, [Vernon] tried to make me do something. She was very—she started crying, and she just—she was crying and she was sad. She looked vulnerable. She looked helpless.

[The State]: What did you do?

3

[B.M.]: I was like, well, what. And not the exact words, because she didn't know how to say it, but she tried to say that [Vernon] tried to make her perform oral sex. And after that she just started crying and bawling. I hugged her tight, and I started crying with her. And then I immediately—I almost blacked out because I remember what I did, but I don't exactly remember everything that I said or heard. After that I went and—

[The State]: You were very upset at that time?

[B.M.]: Yes.

[The State]: Before we move on, is that all she told you at that time? Because she was crying and you were crying, that is all you remember at that point?

[B.M.]: That is all that I can remember.

B.M. stated that prior to this conversation with N.M., she discovered photos of what appeared to be a joint of marijuana on N.M.'s phone. B.M. said that N.M. admitted to smoking marijuana the previous day with her aunt Sofia, who is also Vernon's daughter and a year younger than N.M.

B.M. testified that she confronted Vernon at his house shortly after N.M.'s allegation and "asked him why did you do that [to N.M.]?" B.M. said "he immediately was . . . sorry" and said, "I don't know what you're talking about and . . . denied the situation." She also testified that Vernon texted her shortly afterward and read the text messages to the jury, including one that said, "Sorry, [B.M.], if I did anything wrong. Love you." After confronting Vernon, B.M. said she called the police and filed a report against him at the Mathis Police Department. A few days later, she took N.M. to the CAC for counseling and an interview.

4

N.M. was fourteen years old at the time of trial. N.M. testified that she and her siblings visited Vernon twice over a weekend in May of 2020. N.M. testified that Vernon's house has two bedrooms: Vernon's room, and his son Devin's room. During both visits, N.M. said she spent most of the time hanging out with Sofia in Vernon's room, and her siblings played video games in Devin's room. After Sofia left on the first day, N.M. watched TikTok videos alone in Vernon's room. N.M. said Vernon came into the bedroom looking for something, left, and then came back in again with his phone. She testified:

> He comes in with his phone, and he starts showing me pictures of his private area. Then he is just—he is sitting next to me on the bed. He is scrolling, showing me pictures, and then he finally—at the time I still had my phone out watching TikTok. And I tell him—I say, "Can you stop? I don't want to see that." He says, "Okay." And he leaves the room.

N.M. said that she did not tell her mother about this incident.

The following day, N.M. again hung out with Sofia in Vernon's room, and her siblings played video games in Devin's room. N.M. testified that this time Sofia brought a small black bag that contained marijuana. N.M. said she watched Sofia "roll[] up a blunt of marijuana" and light it. N.M. said Sofia asked if she wanted to smoke it, and eventually she "t[ook] one puff and then coughed it out." Shortly thereafter, Vernon came into the room. N.M. testified that he started smoking the joint and walked out of the room with it. After Sofia left a few hours later, N.M. said she was again alone watching TikTok videos in Vernon's room:

> I am watching TikTok again . . . . It's like probably around 6:00[p.m.], and [Vernon] doesn't come in the room at all the whole time. But when it turned at least 6:00 he comes in the room with a twin-size mattress. The mattress does not have any covers on it. It's just plain, twin size, and he does not have a shirt on at the time. He had his pants on. . . .

5

He lays the bed down next to me, and he lays down on the bed, and he starts unzipping himself, but he is sitting up. He is sitting up at the time, and he is facing the wall. He is not facing towards me. He is undoing his pants while he is facing the wall.

And then he turns back around and he is like—he is looking at me playing with himself, and I'm not—I look to see what he is doing and then I went back on my phone. I could still see from the corner of my eye that he was playing with himself, jacking off.

Then, finally, he gets up, walks towards me while his pants are still unbuckled and—and he is playing with himself in front of me and eventually asks do you want to suck my dick. I say no.

I continue to scroll on TikTok and Instagram, and eventually he puts his penis back in his pants and he walks off, lays back down on the bed, and . . . he starts pulling out his thing again, and he starts jacking off again.

N.M. testified that she felt scared and nervous and was not focusing on her phone. She said she was not affected by the marijuana and "could see everything clearly." N.M. texted her mom and asked if she could come pick her up and then left Vernon's bedroom. Later, Vernon also left the bedroom and dropped N.M. and her siblings back at her grandmother's house.

Green was the State's last witness, and she testified that she interviewed N.M. in May of 2020. Green said that the purpose of a CAC forensic interview is to limit the trauma a child complainant has when retelling a story of abuse. She stated that "any time there are allegations of abuse or neglect, CPS and or law enforcement has the option to bring the children to us for us to interview." Green said that the standard procedure is to "conduct the interview in a neutral environment with non-leading questions."

Green testified that N.M. was ten or eleven years old at the time of her interview. Green stated that N.M. told her that Vernon "wanted her to suck his dick, and she told him no"; "[h]e showed her dick [pics] on his phone"; "[t]here was one time that he changed

6

clothes in front of her, and she described his panties as having a hole in them and his dick was out exposing himself to her."

Vernon testified that he never exposed himself to N.M. and never showed her images of his private area. Vernon said he never saw N.M. and Sofia smoke marijuana and he never smoked marijuana in their presence. Vernon said he did not even own a twin-size mattress. He clarified that he sent the text message, "Sorry, [B.M.], if I did anything wrong" because he did not know what B.M. was accusing him of when she confronted him. He said B.M. opened the door to his house, said something he did not understand, and then "took off." Vernon said N.M. was making up the allegations but did not know why. The only reason he could think of was that N.M. was mad at him that weekend because she wanted him to take her to Sofia's house, but he refused.

The jury, finding both enhancement paragraphs to be true, assessed punishment at forty years' imprisonment. The trial court sentenced Vernon in accordance with the jury's verdict, and this appeal followed.

## II.    OUTCRY WITNESS

By his first issue, Vernon argues that the trial court erred when it allowed Green to serve as the State's outcry witness.

### A.    Standard of Review & Applicable Law

Article 38.072 of the Texas Code of Criminal Procedure allows for the admission of otherwise inadmissible hearsay statements that a child victim of sexual abuse makes to an outcry witness. TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2; *Martinez v. State*, 178 S.W.3d 806, 810 (Tex. Crim. App. 2005). An outcry witness is the first person over the age of eighteen, other than the defendant, to whom the child spoke about the offense. *Id.*

art. 38.072, § 2(a)(3). To qualify for the exception, "[t]he statement must be 'more than words which give a general allusion that something in the area of child abuse is going on'; it must be made in some discernable manner and is event-specific rather than person-specific." *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011) (quoting *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990)); *see Reyes v. State*, 274 S.W.3d 724, 727 (Tex. App.—San Antonio 2008, pet. ref'd) ("Simply put, the outcry witness is the first adult to whom the child tells 'how, when, and where' of the assault.").

"A trial court has broad discretion in determining the admissibility of outcry statements pursuant to this statute, and the trial court's exercise of that discretion will not be disturbed on appeal unless a clear abuse of discretion is established by the record." *Marquez v. State*, 165 S.W.3d 741, 746 (Tex. App.—San Antonio 2005, pet. ref'd); *see Garcia*, 792 S.W.2d at 91–92. A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019).

**B.    Analysis**

By his first issue, Vernon argues that Green could not be the State's outcry witness because the first adult N.M. made an outcry to was to B.M. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a)(3). The State argues that B.M. was not an outcry witness because N.M.'s statement to B.M. was no more than "a general allusion that something in the area of child abuse [wa]s going on and did not describe in any discernable manner the alleged offense."

B.M. stated that N.M. told her "[Vernon] tried to do something to her." She testified that N.M. told her in "not the[se] exact words . . . but she tried to say that [Vernon] tried to

8

make her perform oral sex." N.M.'s statement to B.M. was no more than "a general allusion that something in the area of child abuse [wa]s going on." *See Lopez*, 343 S.W.3d at 140. N.M.'s statement to her mother was not a legitimate basis for excluding Green as an outcry witness, and the trial court did not abuse its discretion in admitting Green's testimony. *See id.*; *Rodriguez v. State*, 689 S.W.3d 386, 393 (Tex. App.—Corpus Christi–Edinburg 2024, pet. ref'd) (holding that school case manager was not an outcry witness because the complainant's statement that "her grandpa had touched her" without "any other details" was general allusion that sexual abuse occurred); *Rosales v. State*, 548 S.W.3d 796, 807 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) ("The statement to Mary that appellant 'touched her the wrong way' is no more than a general allusion that abuse had occurred."); *Reyes*, 274 S.W.3d at 728.

We agree with the State that B.M. was not an outcry witness, and therefore, her testimony would not preclude a proper outcry witness from testifying. We overrule Vernon's first issue.

### III.    HEARSAY

Vernon next argues that the trial court erred when it overruled the defense's objection to B.M.'s testimony because it constituted inadmissible hearsay.

**B.    Standard of Review & Applicable Law**

Hearsay is an out of court statement offered at trial for the truth of the matter asserted in the statement. TEX. R. EVID. 801(d). Hearsay is generally inadmissible unless an exception applies. *Id.* R. 802.

The erroneous admission of a hearsay statement constitutes non-constitutional error that must be disregarded unless the error affects the appellant's substantial rights.

9

*Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *see* TEX. R. APP. P. 44.2(b). An appellate court should not overturn a criminal conviction for non-constitutional error "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or influenced the jury only slightly." *Barshaw*, 342 S.W.3d at 93 (quoting *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001)). "In cases involving the improper admission of outcry testimony, the error is harmless when the victim testifies in court to the same or similar statements that were improperly admitted or other evidence setting forth the same facts is admitted without objection." *Gibson v. State*, 595 S.W.3d 321, 327 (Tex. App.—Austin 2020, no pet.) (collecting cases).

## B. Analysis

We need not determine whether the trial court erred by allowing B.M. to testify about what N.M. told her about the exposure because the same evidence was admitted through N.M.'s and Green's testimony, and in far greater detail.

Vernon complains about B.M.'s testimony regarding statements N.M. made to her about the exposure. Even assuming such testimony constituted hearsay, Vernon's claim fails because other evidence establishing the same facts was properly admitted. *See id.*; *see also Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection."); *Land v. State*, 291 S.W.3d 23, 28–29 (Tex. App.—Texarkana 2009) ("The admission of inadmissible evidence becomes harmless error if other evidence proving the same fact is properly admitted elsewhere (or comes in elsewhere without objection).").

N.M. testified in detail about the exposure and that Vernon asked her to perform oral sex on him. She also testified about telling her mother about the exposure. N.M.

10

testified that after B.M. found the photos of the joint on her phone and reprimanded her, she told her, "'[M]om, I have to tell you something. . . . I said, '[Vernon] tried to make me suck his dick.'" Green also testified that N.M. told her in the CAC interview that Vernon "wanted her to suck his dick." Therefore, even assuming without deciding that the trial court should have excluded the complained-of testimony, the trial court admitted without objection N.M.'s and Green's testimony concerning the exact same facts. Thus, error, if any, was harmless. *See* TEX. R. APP. P. 44.2(b); *Land*, 291 S.W.3d at 28–29; *Valle*, 109 S.W.3d at 509; *see also Ramirez v. State*, No. 13-20-00186-CR, 2022 WL 480245, at *4 (Tex. App.—Corpus Christi–Edinburg Feb. 17, 2022, no pet.) (mem. op., not designated for publication). We overrule Vernon's second issue.

## IV. PRESERVATION OF ERROR

By his third issue, Vernon argues that the prosecutor made improper jury arguments during her closing statement that resulted in reversible error. However, Vernon did not make a timely, specific objection to the prosecutor's closing argument. *See* TEX. R. APP. P. 33.1(a). Improper jury arguments are subject to ordinary preservation rules and failure to lodge a contemporaneous objection will forfeit any complaint. *See Compton v. State*, 666 S.W.3d 685, 727–28 (Tex. Crim. App. 2023); *Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018). Vernon failed to object to the prosecutor's allegedly improper comments, and thus failed to preserve his complaint for appellate review. *See* TEX. R. APP. P. 33.1(a); *Compton*, 666 S.W.3d at 727–28.

By his last issue, Vernon argues that his forty-year sentence constituted cruel and unusual punishment. *See* U.S. CONST. amend. VIII. Vernon did not object or file a motion for new trial on the basis that his sentence was disproportionate to the charged offense

11

or unconstitutional in any manner. *See* TEX. R. APP. P. 33.1(a). To preserve a complaint that a sentence constitutes cruel and unusual punishment, a defendant must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired. *See id.*; *Smith v. State*, 721 S.W.2d 844, 855 (Tex. Crim. App. 1986); *Navarro v. State*, 588 S.W.3d 689, 690 (Tex. App.—Texarkana 2019, no pet.); *Toledo v. State*, 519 S.W.3d 273, 284 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). Furthermore, the forty-year sentence falls within the statutory punishment range for habitual felony offenders. *See* TEX. PENAL CODE ANN. §§ 12.42(d), 21.11; *Trevino v. State*, 174 S.W.3d 925, 927–28 (Tex. App.—Corpus Christi–Edinburg 2005, pet. ref'd) ("Because the sentence imposed is within the punishment range and is not illegal, we conclude that the rights Trevino asserts for the first time on appeal are not so fundamental as to have relieved him of the necessity of a timely, specific trial objection."); *see also Saucedo v. State*, No. 13-23-00170-CR, 2023 WL 5286179, at *2 (Tex. App.—Corpus Christi–Edinburg Aug. 17, 2023, pet. ref'd) (mem. op., not designated for publication). Vernon's last two issues are overruled.

## V.  CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
30th day of August, 2024.

12